Jerry Wayne WILEY and Charles P. Moraglia, individually and on behalf of a class of similarly situated persons, Plaintiffs,

v.

HUGHES CAPITAL CORPORATION, First Securities Transfer Systems, Inc., Robert Zaunere, John Knoblauch, Frederick Mascolo, John Perfetti, Fred Galiardo, Morton Greenberg, Alan Lieb, Sheldon Kanoff, Leonard Tucker, Albert Weiss, Lionel Reifler, Gilbert Beall, Calvo Bofshever & Perry, Howard Ackerman, Susan LaChance, Ira Victor, Dominick Fiorese, John Doe and Richard Roe, Inc., Defendants.

Civ. A. No. 89–1444.

United States District Court,
D. New Jersey.

Aug. 31, 1990.

David L. Hertzog, Fromkin, Hertzog & Becker, P.C., Omaha, Neb., for defendant John L. Knoblauch.

Charles E. Oman, III, Moynahan, Ruskin, Mascolo, Mariani & Minella, Waterbury, Conn., for defendant Frederick Mascolo.

John Perfetti, Bayville, N.Y., pro se defendant.

Dennis R. LaFiura, Pitney, Hardin, Kipp & Szuch, Morristown, N.J., and James M. LaRossa, LaRossa, Mitchell & Ross, New York City, for defendant Fred Galiardo.

Stephen N. Dratch, Greenberg, Margolis, Ziegler, Schwartz, Dratch, Franzblau & Falkin, Roseland, N.J., and George Berger, Berger & Paul, New York City, for defendant Morton Greenberg.

Paul J. Linker, Robinson, Wayne & LaSala, Newark, N.J., for defendant Alan Leib.

John Sand Siffert, Lankler, Siffert & Whol, New York City, for defendant Sheldon Kanoff.

Edward A. Bertele, Levy & Lybeck, P.C., Union, N.J., and Howard B. Sirota, Sirota & Sirota, New York City, for defendant Leonard Tucker.

Barry A. Bohrer, Morvillo, Abromowitz & Grand, New York City, for defendant Albert D. Weiss.

Martin R. Raskin, Raskin & Graham, Miami, Fla., for defendants Lionel Reifler, Susan LaChance and Howard Ackerman.

Gilbert Beall, Dallas, Tex., pro se defendant.

Richard P. Green, Harold Bofshever, Mark C. Perry, Fort Lauderdale, Fla., for defendant Calvo, Bofshever & Perry.

Waller, Mark & Allen, P.C., Denver, Colo., for defendant Ira Victor.

Howard G. Schlesinger, Jaffe & Schlesinger, P.A., Springfield, N.J., and Gerald J. Resnick, Edison, N.J., for plaintiffs.

Stanley Moskowitz, Moskowitz, Altman & Frankel, and Ross & Matza, New York City, for defendant First Securities Transfer Systems, Inc.

Robert L. Zaunere, Pompano Beach, Fla., pro se defendant.

## OPINION

LECHNER, District Judge.

This class action arises from the initial public offering of securities in Hughes Capital Corporation ("Hughes Capital") on or prior to 25 August 1986 pursuant to a registration statement (the "Hughes Registration Statement") declared effective by

the Securities Exchange Commission (the "SEC") on 5 May 1986 and amended by post-effective filings on 8 May, 6 June and 14 July 1986. The basis for this dispute is the finding of the SEC that the Hughes Registration Statement contained material omissions and misrepresentations of fact. This finding led the SEC to issue a stop order on 20 July 1987 (the "Stop Order") suspending the effectiveness of the Hughes Registration Statement.[1]

Plaintiffs Jerry Wayne Wiley ("Wiley") and Charles P. Moraglia ("Moraglia") (collectively the "Plaintiffs") filed this class action on 19 July 1988. Wiley and Moraglia are the name Plaintiffs in this class action and are proceeding individually and on behalf of a putative class of similarly situated persons who purchased the securities of Hughes Capital between 25 August 1986 and 20 July 1987 (the "Aftermarket"). The putative class has yet to be certified pursuant to Rule 23 of the Federal Rules of Civil Procedure.

The Class Action Complaint and Demand for Jury Trial (the "Complaint"), which was refiled on 4 April 1989,[2] names as defendants Hughes Capital, the principals of Hughes Capital[3] and the principals of the brokerage firm of F.D. Roberts Securities, Inc. (the "Roberts Firm"),[4] which acted as underwriter and market maker with respect to the Hughes Capital public offering

pursuant to the Hughes Registration Statement. Additional defendants include the law firm of Calvo, Bofshever & Perry, which was primarily responsible for preparing the Hughes Registration Statement, as well as John Doe and Richard Roe, Inc., who are unknown directors or officers of Hughes Capital or the Roberts Firm.

The Complaint contains eight counts alleging violations of federal and state securities laws and the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 et seq. ("RICO"). Briefly stated, Counts One through Eight of the Complaint assert violations of: Section 12(2) of the Securities Act of 1933 (the "1933 Act"), 15 U.S.C. § 77l (2) ("Count One"); Section 10(b) and Rule 10b–5 of the Securities Exchange Act of 1934 (the "1934 Act"), 15 U.S.C. § 78j(b), 17 C.F.R. 240.10b–5 ("Count Two"); Section 24(a)(1) of the New Jersey Uniform Securities Law ("NJUSL"), N.J.Stat.Ann. 49:3–71(a)(1) ("Count Three"); Section 24(a)(2) of the NJUSL, N.J.Stat.Ann. 49:3–71(a)(2) ("Count Four"); Section 517.221(1) of the Florida Securities and Investor Protection Act ("FISPA"), Fla.Stat.Ann. § 517.211(1) ("Count Five"); Section 517.221(2) of the FISPA, Fla.Stat. Ann. § 517.211(2) ("Count Six"); Section 1962(b) of RICO, 18 U.S.C. § 1962(b) ("Count Seven"); and Section 1962(c) of RICO, 18 U.S.C. § 1962(c) ("Count

---

1. The Stop Order is reported at: *In re Hughes Capital Corp.*, Release No. 33–6725, 38 SEC Docket (CCH) 1136 (20 July 1987) (appended to Affidavit of Lee S. Richards, filed 23 February 1990 ("Richards Aff."), Ex. H). The findings of the SEC are discussed at length in the Stop Order.

2. For purposes of the statute of limitations portion of this discussion, the filing date of the Complaint is deemed to be 19 July 1988. The Complaint was originally filed on 19 July 1988 and was voluntarily dismissed without prejudice pursuant to discussions at a status conference held on 30 March 1989. Counsel for the defendants agreed at the status conference not to raise the statute of limitations as a defense, *except as to those challenges which would have been applicable on 19 July 1988.* The Complaint was refiled on 4 April 1989.

3. Defendants Robert Zaunere ("Zaunere"), John Knoblauch ("Knoblauch"), Frederick Mascolo

("Mascolo"), Lionel Reifler ("Reifler"), Susan LaChance ("LaChance"), Howard Ackerman ("Ackerman"), Ira Victor ("Victor"), Gilbert Beall ("Beall") and First Securities Transfer Systems, Inc. ("FSTS") are alleged to be directors, officers or controlling persons of Hughes Capital. Complaint at ¶ 17.

4. Defendants John Perfetti ("Perfetti"), Fred Galiardo ("Galiardo"), Morton Greenberg ("Greenberg"), Alan Lieb ("Lieb"), Sheldon Kanoff ("Kanoff"), Albert Weiss ("Weiss"), Leonard Tucker ("Tucker") and Dominick Fiorese ("Fiorese") are alleged to be directors, officers or controlling persons of the Roberts Firm. Complaint at ¶ 16.

The Roberts Firm was not named as a defendant in this action after it filed a voluntary petition for bankruptcy pursuant to chapter seven of the United States Bankruptcy Code on 6 March 1989 in the United States Bankruptcy Court for the District of New Jersey. *Id.* at ¶ 14.

Eight").[5]

Presently before the court are the motions of the principals of the Roberts Firm to dismiss the Complaint as against them. For purposes of this Opinion, the moving defendants will be referred to collectively as the "Roberts Defendants."

Defendants Perfetti, Galiardo, Greenberg, Lieb and Weiss have moved to dismiss the Complaint pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure.[6] Defendant Knoblauch, although not alleged to be a principal of the Roberts Firm, has joined in that motion.[7] Defendant Kanoff has joined in the motion to the extent that it challenges the specificity of the Complaint and compliance with the statute of limitations.[8] Defendant Tucker has filed a motion on his own behalf arguing for dismissal of the Complaint on the same grounds as asserted by the other defendants.[9] Defendant Fiorese has not joined in these motions or filed a motion on his own behalf. The Plaintiffs filed a consolidated opposition brief to the motions of the Roberts Defendants.[10] This motion is decided on the basis of the papers submitted pursuant to Fed.R.Civ.P. 78.

5. Subject matter jurisdiction over the federal securities claims is predicated on 15 U.S.C. §§ 77v & 78aa, and 28 U.S.C. § 1337. Jurisdiction over the RICO claims is based on 18 U.S.C. § 1964(c). The state law claims are before the court pursuant to the principles of pendent jurisdiction.

6. *See* Memorandum of Law Submitted on Behalf of Defendants Perfetti, Galiardo, Greenberg, Lieb, Kanoff and Weiss in Support of Their Motion to Dismiss the Complaint, dated 12 June 1989 ("Roberts Defendants' Brief"); Reply Memorandum of Law of Defendants Galiardo, Greenberg, Lieb and Weiss in Support of Their Motion to Dismiss the Complaint, dated 6 February 1990 ("Roberts Defendants' Reply Brief"); Affidavit of Albert D. Weiss, filed 23 February 1990 ("Weiss Aff."); Affidavit of Lee S. Richards, Esq., filed 23 February 1990 ("Richards Aff.").

7. *See* Letter from David L. Herzog, Esq., to chambers, dated 19 June 1989.

8. *See* Letter from John S. Siffert, Esq., to chambers, dated 6 February 1990.

9. *See* Memorandum of Law in Support of Defendant Leonard Tucker's Motion to Dismiss the

### Facts as Alleged in the Complaint

The Complaint consists of 164 separately numbered paragraphs purporting to set forth the various elements of Plaintiffs' eight claims. Paragraphs 35 to 109 of the Complaint, which are contained in Count Two and incorporated by reference into Counts Three through Eight, allege in detail the components of a scheme to manipulate the price of Hughes Capital securities and defraud purchasers of Hughes Capital securities. The Stop Order of the SEC, which explains in detail the existence of the scheme, is incorporated by reference into the Complaint and made a part thereof. Complaint, ¶ 81.

The Complaint explains the purpose of the scheme as follows:

40. In or about August 1985, defendants Reifler, Beall, Mascolo and other individuals attended a series of meetings over the course of a weekend at a country club in Boca Raton, Florida. In those meetings, defendant Reifler proposed that he, defendant Beall and defendant Mascolo form or acquire an entity whose securities would be sold to the public and whose nominal business would be to acquire and hold other corporate entities.

Complaint, dated 4 April 1989 ("Tucker Brief"); Memorandum of Law in Further Support of Defendant Leonard Tucker's Motion to Dismiss the Complaint with Prejudice, dated 21 February 1990 ("Tucker Reply Brief").

10. In opposition to the motions of the Roberts Defendants, the Plaintiffs have submitted the Memorandum of Law of Plaintiffs in Opposition to Defendants' Motions to Dismiss the Complaint, dated 13 October 1989 ("Plaintiffs' Brief") and the Affidavit of Howard G. Schlesinger, Esq., filed 23 February 1990 ("Schlesinger Aff.").

The Plaintiffs' Brief indicates that, in addition to responding to the motions of the Roberts Defendants, it responds to a motion by defendant FSTS. Although FSTS may have served moving papers on the Plaintiffs, no such motion has been filed. Apparently, counsel for FSTS withdrew from the case after serving the Plaintiffs with the moving papers and substitute counsel, if any, has not filed a motion with the court. Accordingly, this Opinion does not include FSTS in the group of Roberts Defendants moving for dismissal of the Complaint.

41. Defendant Reifler further proposed that he, defendant Beall and defendant Mascolo identify and proceed to personally obtain control of suitable acquisition targets. Defendant Reifler explained that the participants in such a scheme would be able to obtain stock in the publicly traded vehicle in exchange for their stock in the entities it would acquire. He further explained that they could enrich themselves by either selling that stock to the public, or by using it to collateralize personal loans. Complaint, ¶¶ 40–41.

Pursuant to the scheme outlined in the Complaint, defendants Reifler, Beall and Mascolo agreed to acquire Hughes Capital as a "shell" company for purposes of holding the securities of targeted acquisition companies. The former owners of Hughes Capital had filed a form S–18 with the SEC on 19 August 1985 for a planned public offering of securities but, due to the death of one of the former owners of the company, the public offering was dropped and the company was to be sold. In December 1985, Reifler and Beall negotiated a stock purchase agreement to purchase Hughes Capital. Rather than execute the stock purchase agreement themselves, however, Reifler, Beall and Mascolo induced and directed certain nominees to execute the stock purchase agreement and to tender funds belonging to Reifler, Beall and Mascolo, in the acquisition of Hughes Capital. Complaint, ¶¶ 38–48.

In January 1986, Reifler, Beall and Mascolo began to meet with counsel for Hughes Capital to discuss amendments to the Hughes Registration Statement. These meetings resulted in the filing of a first amendment to the Hughes Registration Statement on 28 February 1986, which changed the stock-to-warrant ratio of each unit to be offered by Hughes Capital from 1:3 to 1:21. Pursuant to the first amendment, the securities of Hughes Capital included 90,000 units, each of which consisted of one share of common stock priced at $2.00 per share, seven class A warrants exercisable at $2.50 per share, seven class B warrants exercisable at $3.50 per share

and seven class C warrants exercisable at $4.50 per share. Complaint, ¶¶ 8, 49.

The first amendment to the Hughes Registration Statement failed to disclose the stock purchase agreement by which defendants Reifler, Beall and Mascolo obtained control of Hughes Capital through the nominee purchasers and failed to disclose their roles in the management of Hughes Capital and in the preparation of the amended Hughes Registration Statement. Complaint, ¶ 49.

In or about March 1986, defendant Knoblauch agreed with Reifler, Beall and Mascolo to act as nominal owner and chairman of the board of directors of Hughes Capital and signed a stock purchase agreement similar to the one executed by the nominee purchasers. On 17 April 1986, Hughes Capital filed a second amendment to the Hughes Registration Statement, disclosing Knoblauch's alleged acquisition of Hughes Capital but failing to disclose the roles of Reifler, Beall and Mascolo in the ownership and operation of the company. Complaint, ¶¶ 50–53.

On 5 May 1986, the SEC declared the Hughes Registration Statement to be effective. On 6 June 1986, Hughes filed its first post-effective amendment to the Hughes Registration Statement reflecting that the Roberts Firm would underwrite the Hughes Capital public offering on a best efforts, all or none basis. The agreement with the Roberts Firm was negotiated by Fiorese, Galiardo and Kanoff on behalf of the Roberts Firm. Fiorese was hired as a consultant to meet with Roberts Firm representatives and to promote Hughes Capital securities to clients of the Roberts Firm. Complaint, ¶¶ 57–60.

In or about July 1986, Reifler, Beall, Mascolo and Knoblauch identified four entities which they intended to have Hughes Capital acquire after it completed its public offering. The four targeted companies were Conserdyne Corp. ("Conserdyne"), Flat Rock Developers, Inc. ("Flat Rock"), Susan LaChance Interior Design, Inc. ("LaChance Designs") and Insuranshares of America, Inc. ("Insuranshares"). The intention to purchase target companies was

not disclosed to the SEC by Hughes Capital or the Roberts Firm. In addition, the defendants failed to disclose that Knoblauch was the majority shareholder of Conserdyne and that Reifler and Beall were officers and directors of, and with Mascolo had control over, Flat Rock, LaChance Designs and Insuranshares. Complaint, ¶¶ 54–56.

Throughout the summer of 1986, Reifler, Beall and persons directly under their control arranged to purchase in the names of various nominees at least eighty-eight percent of the securities to be sold in the public offering of Hughes Capital, despite the agreement with the Roberts Firm that the public offering would be a best efforts, all or none offering. In furtherance of this scheme, on 12 August 1986 Galiardo and Perfetti, officers of the Roberts Firm, opened thirty-three new accounts at the Roberts Firm in the names of nominees under the control of Reifler, Beall, Mascolo, Victor, Ackerman and LaChance. Fiorese stated to representatives of the Roberts Firm that the initial public offering of Hughes Capital would not be available for purchase by clients of the Roberts Firm because it would be acquired by Hughes Capital. Fiorese told brokers at the Roberts Firm, however, that Hughes Capital securities would be available for purchase by clients of the Roberts Firm in the Aftermarket. These plans were not disclosed in the Hughes Registration Statement. Complaint, ¶¶ 61–67.

The entire public offering of Hughes was purchased for the nominee accounts which Galiardo and Perfetti had opened at the Roberts Firm by the time escrow was broken on 25 August 1986. The $130,000 purportedly paid by the nominees for the Hughes Capital securities actually came from the funds of Reifler, Beall, LaChance and Ackerman. Complaint, ¶¶ 69–71.

The Complaint states the Hughes Registration Statement failed to disclose the following components of the scheme to defraud:

(a) ... the roles of defendants Reifler, Beall and Mascolo as promoters, controlling persons of defendant Hughes [Capital] and statutory underwriter of the Hughes [Capital] Securities;

(b) ... the fact that defendant Knoblauch also discharged the duties of president of Hughes Chemical Corp., an entity controlled by defendants Reifler, Beall, Mascolo, LaChance, Victor, John Doe and Richard Roe, Inc.;

(c) ... that defendant Hughes [Capital] had identified four specific acquisition targets, namely [Conserdyne, Flat Rock, LaChance Designs and Insuranshares], prior to making the public offering of Hughes [Capital] Securities;

(d) ... that the officers and directors of defendant Hughes [Capital] had taken preliminary steps to execute letters of intent to merge with Conserdyne, Flat Rock, [LaChance Designs] and Insuranshares prior to closing of the public offering for defendant Hughes;

(e) ... that defendant Knoblauch was the majority shareholder of Conserdyne, that defendants Reifler and Beall were officers, directors and controlling persons of Flat Rock, [LaChance Designs] and Insuranshares, and that defendant Mascolo was the controlling person of Insuranshares; and

(f) ... that at least eighty-eight (88%) percent of the Hughes [Capital] Securities would in fact be sold to defendants Reifler, Beall, LaChance, Ackerman, Victor, John Doe and Richard Roe, Inc. rather than members of the public so as to manipulate the price of Hughes [Capital] securities in the aftermarket.

Complaint, ¶ 24.

After the public offering closed on 25 August 1986, a public relations firm which had been hired by Reifler, Beall and Knoblauch in July 1986 issued press releases announcing the planned acquisition of the four pre-arranged acquisition candidates. These announcements did not mention that the acquisition candidates were owned by affiliates or control persons of Hughes Capital. The announcements falsely stated that the acquisition candidates were viable companies and that Hughes Capital had funds to acquire the target companies. In addition, the announcements falsely stated

that Hughes Capital had entered into a letter of intent to complete the acquisition of Conserdyne. Complaint, ¶¶ 83–84.

Immediately after the closing of the Hughes Capital public offering on 25 August 1986, the 90,000 shares of common stock included as part of the units were detached from the warrants and resold to the Roberts Firm at a price of $2.25 per share. The warrants remained in the nominee accounts controlled by Reifler, Beall, LaChance, Mascolo, Victor and Ackerman. By the close of the first day of trading in the Aftermarket, the price of Hughes Capital common stock rose to $6.50 per share. By 4 September, the price was as high as $8.50. Complaint, ¶¶ 91, 95.

The Roberts Firm sold short numerous shares of Hughes Capital common stock in the Aftermarket and, on or about 9 September 1986, covered its short position by converting warrants held in the nominee accounts. By 12 September 1986, the Roberts Firm sold to its retail customers all the inventory of Hughes Capital common stock it had acquired from the nominee accounts. The Roberts Firm accounted for 99.8% of trading in Hughes Capital stock from the 25th to the 29th of August 1986 and 84.3% and 77.9% in October and November 1986, respectively. The Roberts Firm maintained the price of Hughes Capital common stock at the $7.00 to $8.50 range through 1 December 1986. Complaint, ¶¶ 91–95.

The Complaint alleges Lieb was responsible for operations at the Roberts Firm and was the individual primarily in charge of approving order tickets executed by the trading department. Lieb initialed every trading ticket approved by him. When Lieb was unsure whether to approve a particular trade Kanoff, as principal in charge of compliance, initialed the ticket. Complaint, ¶ 90.

The Complaint alleges Galiardo, Perfetti, Lieb, Kanoff and Fiorese participated in the fraudulent scheme by

> ma[king] false and misleading statements to their customers and omitt[ing] to state material facts regarding the placement of the Hughes [Capital] Securities in nominee accounts and [the Rob-

erts Firm's] domination and control of the market and its access to Hughes [Capital] warrants; and disseminat[ing] to their retail customers false and misleading information in [the Hughes Registration Statement] and in other statements supplied by Hughes [Capital's] disclosed and undisclosed control persons, which they knew, or were reckless in not knowing, were false and misleading....

Complaint, ¶ 98. The Complaint also alleges the Roberts Firm, Fiorese, Galiardo and Perfetti had actual knowledge of the facts which constituted the scheme to defraud. Complaint, ¶¶ 77–78.

The Complaint does not state the roles which defendants Greenberg, Tucker and Weiss are alleged to have played in the scheme. The Complaint does not discuss these individuals beyond merely naming them as defendants and alleging they were directors, officers or controlling persons of the Roberts Firm. Complaint, ¶¶ 30, 103.

*Facts Submitted by Way of Affidavit*

In addition to the factual allegations of the Complaint, the parties have submitted affidavits which expand upon the circumstances surrounding the sale of Hughes Capital securities. By way of the Richards Affidavit, the Roberts Defendants have submitted the interrogatory answers of Plaintiffs Wiley and Moraglia, copies of press releases relating to the SEC investigation of the sale of Hughes Capital securities and the Stop Order.

The Stop Order, on which the Plaintiffs base the allegations of the Complaint, describes in detail the factual findings of the SEC which lead to the issuance of the Stop Order. Richards Aff., Ex. H. The press releases and other documents contained in the Richards Affidavit indicate that the SEC issued an order which suspended the trading of Hughes Capital securities for ten days in February of 1987 (the "Suspension Order"), resulting in a significant drop in the price of Hughes Capital. Richards Aff., Exs. C–G. According to another affidavit submitted by the Roberts Defendants, the Roberts Firm ceased to sell Hughes Capital securities as a market maker and ceased to recommend any purchases

of those securities to its customers as of 31 December 1986. Weiss Aff., ¶ 4.

In opposition to the motions of the Roberts Defendants, the Plaintiffs have submitted the Schlesinger Affidavit, appended to which are the criminal informations against Reifler, Kanoff and Weiss and the transcripts of their pleas of guilty to those informations.

The criminal informations against those three defendants allege violations of Rule 10b–5 of the 1934 Act. The information against Kanoff indicates he was president, director of compliance and a shareholder and director of the Roberts Firm. Schlesinger Aff., Ex. E. The information against Weiss indicates he was a partner, treasurer and ultimately president of the Roberts Firm. *Id.*, Ex. F. The factual circumstances on which the informations are based arise from fraudulent practices at the Roberts Firm, including the use of nominee accounts, false books and excessive mark-ups, in connection with the sale of stock in several startup companies including Hughes Capital. The information against Reifler concerns his role in the sale of Hughes Capital securities and the conspiracy with principals at the Roberts Firm. *Id.*, Ex. D.

At his plea of guilty to the information, Reifler admitted he and his co-conspirators (1) agreed to purchase Hughes Capital as a shell corporation with no assets for a blind pool public offering of securities, (2) arranged for the Roberts Firm to underwrite the public offering (3) placed the entire public offering in thirty-three nominee accounts at the Roberts Firm, through which Reifler and his co-conspirators directed trading activity of Hughes Capital securities and shared in the profits, (4) employed the Roberts Firm to use pressure to sell the securities in the Aftermarket at inflated prices and (5) participated in meetings with organized crime figures and principals of the Roberts Firm to discuss Fiorese's role in the sale of Hughes Capital. Schlesinger Aff., Ex. A (Transcript of Proceedings, dated 15 August 1989) at 13–14.

Reifler testified the Roberts Firm arbitrarily increased and manipulated the Aftermarket price of Hughes Capital securities and thereafter exercised the warrants to generate large profits. Reifler stated the Roberts Firm had charged excessive and undisclosed markups and received great profits in exchange for its participation in the fraud. Reifler also admitted the Hughes Registration Statement failed to disclose the activity in which the Roberts Firm had been involved and that the Roberts Firm dominated trading of Hughes Capital securities in the Aftermarket. *Id.* at 15–19.

Kanoff, who was president, director and shareholder of the Roberts Firm, admitted at his guilty plea that "between around March 15th, 1985 and February 1989 [he] did agree and conspire with others including Fred Galiardo, Leonard Tucker, John Perfetti, Al Lieb, Albert Weiss and others to use and employ manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities at [the Roberts Firm]...." *Id.*, Ex. B (Transcript of Proceedings, dated 27 September 1989) at 18. Kanoff further admitted that "Galiardo, the Chairman of the Board of [the Roberts Firm], directed that cash be generated out of [the Roberts Firm] to pay organized crime figures who maintained undisclosed interests in [the Roberts Firm]." *Id.* at 19.

Kanoff acknowledged he and brokers at the Roberts Firm concealed material information from the investing public, such as the facts that the Roberts Firm controlled, dominated and arbitrarily established the market for Hughes Capital securities, that principals and employees of the Roberts Firms had undisclosed interests in the Hughes Capital securities and that the Roberts Firm was actively manipulating the prices of such securities and charged excessive markups resulting in large trading profits. Kanoff also stated: "Tucker, an officer and partner of [the Roberts Firm] who became Chairman of the Board of [the Roberts Firm], exerted control over many of the companies which [the Roberts Firm] brought public through relative or friends that were controlling shareholders, officers or employees." *Id.* at 28. Finally,

Kanoff admitted he benefitted from the manipulation of Hughes Capital securities, knew the stock would sell for an inflated price in the Aftermarket and was aware his co-conspirators concealed their beneficial interests in the stock which they were recommending over the telephone at inflated prices.

The Plaintiffs have also submitted the guilty plea of defendant Weiss. Weiss, a partner, treasurer and ultimately president of the Roberts Firm, admitted that he, Tucker, Galiardo, Lieb, Perfetti, Kanoff and others used manipulative devices in connection with the sale of securities at the Roberts Firm. He acknowledged the use of material misrepresentations, maintenance of false books and records, manipulation of stock prices and use of nominee accounts by himself and his co-conspirators to obtain illegal profits from the sale of stock at the Roberts Firm. In addition, Weiss admitted "various co-conspirators lined up [A]ftermarket sales to investors at inflated prices and prepared [A]ftermarket order tickets before the purported public offering in the particular ... stock was closed." *Id.*, Ex. C at 21.

Weiss also admitted:

With respect to the false books and records, ... at the instructions of Fred Galiardo, who was Chairman of the Board of [the Roberts Firm], [Weiss] did arrange for the payment of fictitious bonus and salary payment in order to generate money which was passed in the form of cash to individuals [he] understood were connected with organized crime.

*Id.* at 22.

While the guilty plea transcripts elaborate on the roles of the individual Roberts Defendants in the scheme to defraud, Greenberg is never mentioned. His participation, if any, in the management of the Roberts Firm or in the specific actions relating to the sale of Hughes Capital securities remains unexplained. Neither the Complaint nor the extraneous materials submitted by the parties inculpates Greenberg in the conduct at issue.

*Discussion*

The Roberts Defendants have moved to dismiss all Counts of the Complaint pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief may be granted. In addition, the Roberts Defendants seek to dismiss the federal securities law claims for failure to comply with the statute of limitations or, in the alternative, seek dismissal with leave to replead consistent with the specificity requirements of Fed.R.Civ.P. 9(b).

Because dismissal under Rule 12(b)(6) results in a determination on the merits at an early stage in the Plaintiffs' cause, they are afforded the safeguard of having all of their allegations taken as true and all reasonable factual inferences drawn in their favor. *Wisniewski v. Johns–Manville Corp.*, 759 F.2d 271, 273 (3d Cir.1985); *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir.1977). "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff[s] can prove no set of facts in support of [their] claim which would entitle [them] to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). *Accord Cruz v. Beto*, 405 U.S. 319, 321, 92 S.Ct. 1079, 1081, 31 L.Ed.2d 263 (1972); *Angelastro v. Prudential–Bache Sec.*, 764 F.2d 939, 944 (3d Cir.1985), *cert. denied*, 474 U.S. 935, 106 S.Ct. 267, 88 L.Ed.2d 274 (1985).

■ When making a determination under Rule 12(b)(6), the court cannot consider matters outside the pleadings. In this case, the parties have submitted affidavits in connection with the motions of the Roberts Defendants. When either or both parties presents extraneous material as part of their motion or opposition, the court has the discretion to accept the extraneous material and convert the Rule 12(b)(6) motion to one for summary judgment pursuant to Fed.R.Civ.P. 56. Fed.R.Civ.P. 12(b); [11]

**11.** Rule 12 of the Federal Rules of Civil Procedure states:

If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be

*Rose v. Bartle*, 871 F.2d 331, 339–40 (3d Cir.1989); *Elysian Fed. Sav. v. First Interregional Equity*, 713 F.Supp. 737, 740 (D.N.J.1989); 5 C. Wright & A. Miller, Federal Practice and Procedure § 1366 at 678 (West 1969 & Supp.1989).

The Plaintiffs request conversion of the Rule 12(b)(6) motions of the Roberts Defendants to Rule 56 motions for summary judgment "to a limited extent." Plaintiffs' Brief at 5. The Plaintiffs, however, do not indicate what the "limited extent" should be. While the Richards Affidavit relates only to the issue of compliance with the statute of limitations on Counts One and Two of the Complaint, the Weiss Affidavit contains information relating to the substantive allegations of the Complaint.

In apparent contradiction of the request to convert the motion "to a limited extent," the Plaintiffs submitted the Schlesinger Affidavit, attached to which are the criminal informations against and guilty plea transcripts of defendants Reifler, Kanoff and Weiss for crimes related to the claims in this lawsuit. The submission of the Schlesinger Affidavit directly impacts the substantive issues raised by the Rule 12(b)(6) motion of the Roberts Defendants. Because affidavits have been submitted in support of and in opposition to the Rule 12(b)(6) motions of the Roberts Defendants, the motions are converted to Rule 56 motions for summary judgment. *Elysian Fed.Sav.*, 713 F.Supp. at 740.

The requirement of Rule 12(b) that "the parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56" has been satisfied. Fed.R.Civ.P. 12(b). Both sides have had ample opportunity to submit affidavits and, indeed, they have taken advantage of this opportunity. The request for conversion to Rule 56 was presented in the opposition papers of the Plaintiffs along with the Schlesinger Affidavit; the Roberts Defendants did not object to this request in their reply papers.[12]

To prevail on a motion for summary judgment, the moving party must establish "there is no genuine issue as to any material fact and that [it] is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The district court's task is to determine whether disputed issues of fact exist, but the court cannot resolve factual disputes in a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986). All evidence submitted must be viewed in a light most favorable to the party opposing the motion. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

Although the summary judgment hurdle is a difficult one to overcome, it is by no means insurmountable. As the Supreme Court has stated, once the party seeking summary judgment has pointed out to the court the absence of a fact issue,

> its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.... In the language of the Rule, the non-moving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*' ... Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'

---

granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56. Fed.R.Civ.P. 12(b).

**12.** The Roberts Defendants' only reference to the Schlesinger Affidavit is a one-paragraph assertion that the Plaintiffs "misconceive the nature of this motion" and the Schlesinger Affidavit is therefore "irrelevant." Roberts Defendants' Reply Brief at 14. However, the Roberts Defendants cannot have it both ways. They have sought consideration of extraneous material going to the substantive allegations of the *Complaint* yet they seek to exclude similar material submitted by the Plaintiffs. It was the Roberts Defendants who opened the door to conversion of this motion to a Rule 56 motion by the submission of the Richards Affidavit and the Weiss Affidavit.

*Matsushita,* 475 U.S. at 586–87, 106 S.Ct. at 1356 (emphasis in original, citations and footnotes omitted).

■ The Court elaborated on the standard in *Anderson v. Liberty Lobby, Inc.:* "If the evidence [submitted by a party opposing summary judgment] is merely colorable ... or is not significantly probative ... summary judgment may be granted." 477 U.S. at 249–50, 106 S.Ct. at 2511 (citations omitted). The Supreme Court went on to note in *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986): "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose." *Id.* at 323–24, 106 S.Ct. at 2553 (footnote omitted). Thus, once a case has been made in support of summary judgment, the party opposing the motion has the affirmative burden of coming forward with *specific* facts evidencing a need for trial. *See* Fed.R.Civ.P. 56(e).

A. *Statute of Limitations Under Federal Securities Laws*

■ An action based on Section 12(2) of the 1933 Act must be brought "within one year after discovery of the untrue statement or omission, or after such discovery should have been made by the exercise of reasonable diligence." [13] 15 U.S.C. § 77m. Liability of a controlling person under Section 15 of the 1933 Act is derivative of Section 12(2) and the limitations period is therefore the same. *Herm v. Stafford,* 663 F.2d 669, 679 (6th Cir.1981); *Insurance Consultants of America v. Southeastern Ins. Group,* 746 F.Supp. 390, 404–05 (D.N. J.1990); *Hill v. Equitable Trust Co.,* 562 F.Supp. 1324, 1341 (D.Del.1983).

■ The one year limitations period is also applicable to claims under Section 10(b) and Rule 10b–5 of the 1934 Act.

*McCarter v. Mitcham,* 883 F.2d 196, 202 (3d Cir.1989); *Gatto v. Meridan Medical Assoc.,* 882 F.2d 840 (3d Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 1136, 107 L.Ed.2d 1041 (1990); *In re Data Access Systems Securities Litigation,* 843 F.2d 1537, 1550 (3d Cir.) (in banc), *cert. denied,* 488 U.S. 849, 109 S.Ct. 131, 102 L.Ed.2d 103 (1988); *Elysian Fed. Sav.,* 713 F.Supp. at 741. Counts One and Two must be dismissed if the Plaintiffs, in exercising reasonable diligence, knew or should have known of the existence of the alleged fraud of the Roberts Defendants more than one year prior to 19 July 1988, the date the Complaint was originally filed.[14]

■ The Plaintiffs argue the Complaint is timely because it was filed within one year after 20 July 1987, the date the SEC issued the Stop Order which suspended the effectiveness of the Hughes Registration Statement. The Plaintiffs argue it was the Stop Order which triggered the statute of limitations and Plaintiffs, using reasonable diligence, had no way of knowing of the fraud involved in the sale of Hughes Capital securities prior to its disclosure in the Stop Order.

The Roberts Defendants argue the statute of limitations runs not from " 'the time at which a plaintiff becomes aware of all of the various aspects of the alleged fraud, but rather [from] the time at which plaintiff *should* have discovered the general fraudulent scheme.' " *Arneil v. Ramsey,* 550 F.2d 774, 780 (2d Cir.1977) (quoting *Berry Petroleum Co. v. Adams & Peck,* 518 F.2d 402, 410 (2d Cir.1975)) (emphasis added); *see Elysian Fed. Sav.,* 713 F.Supp. at 745; *Bradford–White Corp. v. Ernst & Whinney,* 699 F.Supp. 1085, 1091 (E.D.Pa. 1988), *rev'd on other grounds,* 872 F.2d 1153 (3d Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 542, 107 L.Ed.2d 539 (1989); *Gruber v. Price Waterhouse,* 697 F.Supp. 859, 863–64 (E.D.Pa.1988). The statute of limitations is said to commence when the plaintiff learns of the facts underlying the basis

---

**13.** The statute of limitations further provides that an action may not be brought in any event beyond three years after the sale of the securities. 15 U.S.C. § 77m. This provision of the statute is inapplicable to the case at bar.

**14.** *See supra* note 2.

of his cause of action, not the existence of the cause of action itself. *Bradford–White Corp.*, 699 F.Supp. at 1091.

Relying on the often repeated rule that securities Plaintiffs may not leisurely await prosecution of their claims in defiance of "storm warnings," *Elysian Fed. Sav.*, 713 F.Supp. at 745; *see Cook v. Avien, Inc.*, 573 F.2d 685, 697 (1st Cir.1978); *Klein v. Bower*, 421 F.2d 338, 343 (2d Cir.1970); *Gruber*, 697 F.Supp. at 863, the Roberts Defendants argue the Plaintiffs' claims are time barred because the Plaintiffs were put on inquiry notice of the fraud as early as 13 February 1987 and failed to act on their claims until the SEC issued the Stop Order.

The Roberts Defendants claim that on 13 February 1987 the SEC issued the Suspension Order, which suspended trading in Hughes Capital securities for ten days and warned to Hughes Capital investors notifying them of inadequate disclosure and unusual market activity in the stock.[15] Richards Aff., Ex. C. As further notice of the possibility of fraud, the Roberts Defendants note that in the weeks following the suspension in trading, the price of Hughes Capital stock plunged from a high of $14.00 per share in February 1987 to between $5.00 and $8.00 per share. *Id.*, Ex. F. Notification of the suspension of trading was disseminated through several publications, including the SEC Docket, SEC News Digest, Reuters and PR newswire. *Id.*, Ex. D, E & F. In addition, Hughes Capital issued a press release referring to and attempting to explain the suspension of trading. *Id.*, Ex. G.

In determining whether a plaintiff exercised due diligence in investigating fraud, factors to be considered include "the existence of a fiduciary relationship, concealment of the fraud, opportunity to detect it, position in the industry, sophistication and expertise in the financial community, and

knowledge of related proceedings." *Elysian Fed. Sav.*, 713 F.Supp. at 745. In addition, the court must consider "the nature of the misleading statements alleged, the opportunity to discover the misleading nature of the statements, and the subsequent actions of the parties." *Cook*, 573 F.2d at 696–97.

Count Two of the Complaint alleges the 20 July 1987 Stop Order "disclosed for the first time that the named defendants had intentionally and recklessly violated federal and state registration and anti-fraud full disclosure statutes." Complaint, ¶ 108. The only allegation in Count One of the Complaint pertaining the statute of limitations is the following conclusory statement:

> This suit has been brought by the named plaintiffs on behalf of themselves and the putative class within the one year/three year statute of limitations provided for actions brought under Section 12(2) of the 1934 Act.

Complaint, ¶ 34. The Complaint contains no allegations relating to discovery of the alleged fraud of the defendants.

The Roberts Defendants argue these conclusory allegations are insufficient to plead compliance with the statute of limitations and the Complaint should be dismissed. In *Krome v. Merrill Lynch & Co.*, 637 F.Supp. 910, *vacated in part on other grounds*, 110 F.R.D. 693 (S.D.N.Y.1986), the court stated:

> To adequately plead compliance with this requirement, the plaintiff must set forth: (1) the time and circumstances of the discovery of the fraudulent statement; (2) the reasons why it was not discovered earlier (if more than one year has lapsed); and (3) the diligent efforts which plaintiff undertook in making or seeking such discovery.

**15.** The Suspension Order stated:

> The Commission suspended trading in the securities of Hughes Capital Corporation because of an apparent lack of current adequate and accurate public information concerning the company's business operations and recent unusual market activity in the company's stock.

> The Commission cautions brokers, dealers shareholders and prospective purchasers that they should carefully consider the foregoing information.
>
> *See* SEC Release No. 34–24097, 37 SEC Docket (CCH) 840 (13 February 1987) (Richards Aff., Ex. C.). *The Suspension Order did not reveal the information upon which it was based or the facts which gave rise to suspicion.*

637 F.Supp. at 914; *see also Alfaro v. E.F. Hutton & Co.*, 606 F.Supp. 1100, 1112 (E.D. Pa.1985); *Hill v. Der*, 521 F.Supp. 1370, 1389 (D.Del.1981); *Kroungold v. Triester*, 407 F.Supp. 414, 419 (E.D.Pa.1975).

The Roberts Defendants are correct in pointing out the complete absence of any allegation in the Complaint relating to the facts or circumstances surrounding the Plaintiffs' discovery of the fraud at Hughes Capital. While the allegations of the Complaint with regard to the discovery of the alleged fraud are sparse and, at least as to Count One, fall below the standards for adequate pleading of compliance with the statute of limitations, dismissal of the Complaint is not warranted.

As Plaintiffs argue, the data submitted by the Roberts Defendants in connection with this motion create a factual issue as to why the Plaintiffs did not discover the fraud prior to the issuance of the Stop Order. While it is clear the Stop Order put the Plaintiffs on actual notice of the fraud in connection with the sale of Hughes Capital securities, there is a genuine issue of material fact as to whether preceding events were sufficient to establish inquiry notice.

Attached to the Richards Affidavit, which was submitted by the Roberts Defendants, are copies of the deposition transcripts of Wiley and Moraglia. These transcripts state that, subsequent the issuance of the Stop Order, the Plaintiffs learned of the fraud in connection with the sale of Hughes Capital securities upon receiving notification from counsel in or about April or May of 1988. Richards Aff., Exs. A & B (interrogatory answers 47(c), 48–52).

The Suspension Order, which was issued on 13 February 1987, did not state the grounds or specific facts upon which it was based. It notified investors that there appeared to be a "lack of current, adequate and accurate public information concerning the company's business operations and recent unusual market activity in the company's stock." Richards Aff., Ex. C. While this may have given rise to suspicion on the part of investors in Hughes Capital, the company immediately issued a press release attempting to conceal the existence of fraudulent activity. The press release stated "the company [was] not aware of the cause of any recent unusual market activity in the company's stock" and discussed the recent "completion" of a purported merger with Conserdyne and the termination of purported letters of intent to acquire Insuranshares, LaChance Designs and Flat Rock. Richards Aff., Ex. E.

At no time prior to release of the 20 July 1987 Stop Order was there disclosure of the factual allegations on which the Complaint is based. *Compare Insurance Consultants of America*, 746 F.Supp. at 410 (holding securities fraud claims to be untimely because plaintiffs were on notice of facts of fraud more than one year prior to commencement of action). If the events prior to issuance of the Stop Order put the Plaintiffs on inquiry notice, then it remains to be determined whether the Plaintiffs could have uncovered the fraud in the face of attempts by management of Hughes Capital to cover up the fraud. This factual question cannot be decided on the basis of the partial record presently before the court. *See, e.g., Alfaro*, 606 F.Supp. at 1111; *Hill v. Equitable Bank Nat'l Ass'n*, 599 F.Supp. 1062, 1077 (D.Del.1984); *see also Kubik v. Goldfield*, 479 F.2d 472, 477 (3d Cir.1973); *Cook*, 573 F.2d at 697.

The Plaintiffs bear the burden of proof of compliance with the statute of limitations. *ITG, Inc. v. Price Waterhouse*, 697 F.Supp. 867, 870 (E.D.Pa.1988) (citing *Cook*, 573 F.2d at 695). Although the Plaintiffs have barely met this burden by relying entirely on the submissions of the Roberts Defendants, there exists a genuine issue of material fact as to whether the Plaintiffs did or should have uncovered the fraud prior to 20 July 1987. The motion of the Roberts Defendants to dismiss Counts One and Two of the Complaint is converted to a motion for summary judgment and denied.

**B.** *Claims Under the 1933 Act*
### 1. *Section 12(2)*

The Roberts Defendants argue

Plaintiffs' claims under Section 12(2)[16] of the 1933 Act must be dismissed for failure to allege privity with the individual Roberts Defendants. The Roberts Defendants base their argument as to Section 12(2) on precedent of the Third Circuit in *Collins v. Signetics Corp.*, 605 F.2d 110 (3d Cir.1979), which held that a plaintiff may sue only the immediate seller from which he purchased a security. *Id.* at 113.

In their opening brief, the Roberts Defendants neglected to recognize that the Supreme Court disposed of the requirement of privity from liability under section 12(1) of the 1933 Act in *Pinter v. Dahl*, 486 U.S. 622, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988). In so doing, the Court explicitly referred to and quoted from the *Collins* case as among the authorities which the Court declined to follow. *Id.* at 644, 108 S.Ct. at 2077.

In *Pinter*, the Court ruled: "A natural reading of the statutory language [of section 12(1)] would include in the statutory seller status at least some persons who *urged* the buyer to purchase." *Id.* (emphasis added). The Court further explained: "The language and purpose of § 12(1) suggest that liability extends only to the person who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner." *Id.* at 647, 108 S.Ct. at 2079.

Because the critical language of Section 12(1) is identical to that of Section 12(2) and because the policies of the securities laws, as discussed by the Supreme Court, favor disclosure, the Third Circuit has held there is "no reason to distinguish the scope of 'seller' for purposes of § 12(1) and § 12(2)." *Craftmatic Securities Litigation v. Kraftsow*, 890 F.2d 628, 635 (3d Cir.1989). Thus, the privity requirement of *Collins* has been squarely rejected; the Third Circuit now follows the reasoning of

*Pinter* for purposes of Section 12(2). *Id.* at 636.

■ Without explicitly acknowledging the error in their opening argument, the Roberts Defendants nevertheless claim the Plaintiffs have failed to alleged facts sufficient to hold the Roberts Firm liable as a solicitor of offers on Hughes Capital securities under *Pinter*. Roberts Defendants' Reply Brief at 2–5.

In the Third Circuit, "[t]he purchaser must demonstrate *direct and active participation* in the solicitation of the immediate sale to hold the issuer liable as a § 12(2) seller." *Craftmatic*, 890 F.2d at 636 (emphasis added). The focus of the inquiry is on the alleged solicitor's relationship to the purchaser, not the degree of his involvement in the sales transaction and its surrounding circumstances. *Id.*

It is clear the Roberts Firm was a direct and active participant in the solicitation of the sale of Hughes Capital securities. The plea transcripts of Weiss, Kanoff and Greenberg, which were submitted by the Plaintiffs in opposition to these motions, establish the active participation of the Roberts Firm in the solicitation of purchasers of Hughes Capital securities. The Complaint generally and specifically alleges the Roberts Firm, as managing underwriter and market maker for Hughes Capital, was a direct participant in the distribution of the Hughes Registration Statement which contained the allegedly false and misleading statements on which this lawsuit is based. Complaint, ¶ 14.

Representatives of the Roberts Firm are alleged to have opened nominee accounts into which all of the proceeds of the initial public offering of Hughes Capital were deposited. Complaint, ¶¶ 65–66. The Roberts Firm dominated and controlled the offer and sale of Hughes Capital securities in the Aftermarket. Complaint, ¶¶ 92–95.

---

**16.** Section 12 of the 1933 Act provides as follows:

Any person who—

 (1) offers or sells a security in violation of section 77e of this title, or

 (2) offers or sells a security ... by means of a prospectus ... which includes an untrue statement of a material fact or omits to state a material fact ...

shall be liable *to the person purchasing such security from him* ....

15 U.S.C. § 77*l* (emphasis added).

The Roberts Firm also purchased shares from the nominees accounts and resold them at inflated prices to its clients. These allegations are supported by the Stop Order of the SEC, which is incorporated into the Complaint.

The Roberts Defendants submitted the Weiss Affidavit which states: "As of December 31, 1986, [the Roberts Firm] had ceased to sell securities of Hughes Capital Corporation as a market maker and ceased to recommend any purchases of those securities by its customers as a market maker." Weiss Aff., ¶ 4. The Plaintiffs, however, have submitted the transcript of Weiss's guilty plea, at which he admitted the Roberts Firm sold securities through February 1989:

> Q. Is it true that between on or about July 1985 and *February 1989* you did agree and conspire with others, including Leonard Tucker, Fred Galiardo, Al Lieb, John Perfetti, Sheldon Kanoff and others to use and employ manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities at [the Roberts Firm]?
>
> A. Yes, your Honor.

Schlesinger Aff., Ex. C (Transcript, dated 27 September 1989, at 16) (emphasis added). The criminal information against Weiss also states the Roberts Firm acted as underwriter and market maker of Hughes Capital and other companies between July 1985 and February 1989. *Id.,* Ex. F. In addition, Weiss admitted at his guilty plea that he intended to and in fact did benefit from these activities. These submissions create a genuine issue of material fact and prevent the summary disposition of claim for liability of the Roberts Firm under Section 12(2).

## 2. *Section 15*

The Plaintiffs allege in the Complaint that the individual Roberts Defendants are "controlling persons" of the Roberts Firm and, as such, are liable for any Section 12(2) violations of the Roberts Firm pursuant to Section 15.[17] The Roberts Defendants argue the Plaintiffs cannot sustain a claim under section 15 because they fail to allege the Roberts Defendants are controlling persons of the Roberts Firm or the Roberts Defendants were culpable participants in the fraud regarding the sale of Hughes Capital securities. The Plaintiffs argue, however, the plea transcripts of defendants Reifler, Kanoff and Weiss not only admit their individual participation in the securities fraud, but also inculpate defendants Fiorese, Tucker, Galiardo, Perfetti and Lieb.

Controlling person liability exists where the defendant has direct or indirect power over the management or policies of a person, in this case the Roberts Firm. *Rochez Bros., Inc. v. Rhoades,* 527 F.2d 880, 890 (3d Cir.1975). The law is unsettled whether the status of a defendant as an officer or director of a Section 12(2) violator, without the additional allegation that such defendant had actual control over the controlled person, is sufficient to establish a claim of controlling person liability under Section 15. *Cammer v. Bloom,* 711 F.Supp. 1264, 1293 (D.N.J.1989).

The Third Circuit appears to embrace a lenient pleading rule, to the extent it gives "heavy consideration to the power *or potential power* to influence and control the activities of a person, as opposed to the actual exercise thereof." *Rochez Bros., Inc.,* 527 F.2d at 890 (emphasis added); *see Cammer,* 711 F.Supp. at 1295 (citing *Rochez Bros., Inc.* and *Gould v. American–Hawaiian S.S. Co.,* 535 F.2d 761, 779 (3d

---

**17.** Section 15 of the 1933 Act states:

Every person who, by or through stock ownership, agency or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under sections 77k or 77*l* [i.e., Section 12] of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.

15 U.S.C. § 77*o.*

Cir.1976)). However, it is clear that for liability to exist, the controlling person must have been a "culpable participant" in the fraud perpetrated by the controlled person. *Rochez Bros., Inc.*, 527 F.2d at 890 (citing *Lanza v. Drexel & Co.*, 479 F.2d 1277, 1299 (2d Cir.1973)); *see also Sharp v. Coopers & Lybrand*, 649 F.2d 175, 185 (3d Cir.1981), *cert. denied*, 455 U.S. 938, 102 S.Ct. 1427, 71 L.Ed.2d 648 (1982); *Gould*, 535 F.2d at 780; *Laven v. Flanagan*, 695 F.Supp. 800, 809 (D.N.J.1988).

 The Roberts Defendants urge this court to adopt a standard of pleading which would require the Plaintiffs to allege not only control by status, but also actual control of the Roberts Firm to survive a motion to dismiss. *Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1441 (9th Cir.1987). It is unnecessary, however, to rule precisely on the issue of whether the Third Circuit would adopt the two-part pleading test of *Wool.* The materials set forth in the affidavits submitted by the parties present factual data which, viewed in a light most favorable to the Plaintiffs, create a genuine issue of material fact as to whether the Roberts Defendants were control persons of the Roberts Firm and were culpable participants in the scheme to defraud.

The *Wool* case acknowledges the test of control should be "construed liberally and flexibly." *Id.* Moreover, "where ... the corporate officers are a narrowly defined group charged with the day-to-day operations of a public corporation, it is reasonable to presume that these officers had the power to control or influence the particular transactions giving rise to the securities violation." *Id.* Indeed, where the Plaintiffs allege fraud perpetrated by means of "group published" documents such as prospectuses and registration statements, "it is reasonable to presume that these are the collective actions of the corporate officers." *Id.* at 1442.

The Complaint states the Roberts Defendants were officers and directors of the Roberts Firm. Complaint, ¶ 16 & 30. Count One of the Complaint does not name individual Roberts Defendants in connec-tion with the allegedly fraudulent conduct of the Roberts Firm, but it is alleged:

> [u]nless some different basis of liability is specifically asserted with respect to any individual named defendant, liability of each of the named defendants is predicated upon the proposition that each of them, acting alone or in concert with the others, initiated, joined in, became a member of, or otherwise negligently, recklessly and/or knowingly materially advanced, aided and abetted an unlawful agreement to violate the registration and anti-fraud full disclosure requirements of Section 12(2) ...

Complaint, ¶ 21. In addition, Count One states the Roberts Firm failed to act with due diligence or acted with reckless disregard in ascertaining the existence of false and misleading statements in the Hughes Registration Statement. Complaint, ¶ 25.

The narration of events on which Count Two of the Complaint is based implicate all the Roberts Defendants in culpable conduct with the exception of Greenberg, Tucker and Weiss, who are never named in the substantive allegations of Count Two. Complaint, ¶¶ 58–59, 66, 71, 73, 79, 90, 96–98. The affidavits submitted in connection with this motion implicate Tucker and Weiss in the conduct at issue in this case. Greenberg is the only Roberts defendant who is not implicated as having had knowledge of or participating in the affairs of the Roberts Firm.

Weiss admitted at his guilty plea that, as partner and treasurer of the Roberts Firm, he personally participated in the fraudulent scheme described in the Complaint, and in so doing implicated the other Roberts Defendants, except Greenberg, by specific references to their actions. Schlesinger Aff., Ex. C *passim.* Kanoff stated at his guilty plea that "Tucker, an officer and partner of [the Roberts Firm] who became Chairman of the Board of [the Roberts Firm], exerted control over many of the companies which [the Roberts Firm] brought public through relative or friends that were controlling shareholders, officers or employees." *Id.*, Ex. B at 28. Kanoff also implicated Galiar-

do, Perfetti, Lieb and Weiss in the fraudulent scheme. Greenberg, however, is never mentioned in the plea transcripts of Reifler, Weiss or Kanoff.

None of the documentation submitted in connection with these motions suggests Greenberg played any role in the scheme to defraud investors of Hughes Capital. Greenberg's involvement in this case is limited to two references to him in the Complaint: he is a named defendant and he is alleged to be a controlling person of the Roberts Firm. The conclusory allegation that he is a controlling person, however, is without support in the record. The Plaintiffs have failed to meet their burden of coming forward with specific facts in support of the allegations of the Complaint as they concern Greenberg's role in the fraud. The extraneous material submitted by the Plaintiffs does not even support the allegation that Greenberg was a director, shareholder or officer of the Roberts Firm. As a matter of law, it cannot be said that Greenberg is a controlling person of the Roberts Firm; nor can it be said that he was personally responsible for the Plaintiffs' injuries. Accordingly, summary judgment is granted in favor of Greenberg as to Count One of the Complaint.

Summary judgment is denied as to the other Roberts Defendants. The facts discussed above raise genuine issues of material fact as to whether the Roberts Defendants, other than Greenberg, were controlling persons of the Roberts Firm. As this is a corporate fraud case involving violations of the disclosure requirements applicable to the Hughes Registration Statement, it is reasonable to presume the actions of the Roberts Firm were the actions of the Roberts Defendants. *Wool,* 818 F.2d at 1442. "Whether a defendant is a controlling person within the meaning of federal securities law is a question of fact."

*In re Worlds of Wonder Securities Litigation,* 694 F.Supp. 1427, 1435 (N.D.Cal. 1988). This prevents granting summary judgment as to the remaining Roberts Defendants. In addition, because the record is not complete at this point, the Plaintiffs are given leave to replead at a later date to include more specific allegations against Greenberg, if appropriate and pursuant to Fed.R.Civ.P. 11.

### C. *Claims Under the 1934 Act*

■ Section 10(b) [18] of the 1934 Act, and Rule 10b–5 [19] promulgated thereunder, proscribe fraudulent conduct in the sale of securities. To prevail in an action brought under Rule 10b–5(b), Plaintiffs must establish six elements: (1) a false representation of (2) a material (3) fact, (4) defendant's knowledge of its falsity and his intention that the Plaintiffs rely on it, (5) the Plaintiffs' reasonable reliance thereon and (6) his resultant loss. *Zlotnick v. TIE Communications,* 836 F.2d 818, 821 (3d Cir. 1988); *Peil v. Speiser,* 806 F.2d 1154, 1160 (3d Cir.1986); *Elysian Fed. Sav.,* 713 F.Supp. at 741; *Cammer,* 711 F.Supp. at 1276. To establish a violation of Rules 10b–5(a) or (c), Plaintiffs must demonstrate that the Roberts Defendants employed any device, scheme or artifice to defraud or that they engaged in any act practice or course of business which operated or would operate as a fraud or deceit upon the Plaintiffs. *Hilgeman v. National Ins. Co.,* 547 F.2d 298 (5th Cir.1977).

■ Recklessness, as opposed to actual intent, suffices for a 10b–5 violation. *Eisenberg v. Gagnon,* 766 F.2d 770, 777 (3d Cir.), *cert. denied,* 474 U.S. 946, 106 S.Ct. 342, 88 L.Ed.2d 290 (1985); *Cook,* 573 F.2d at 692. The Roberts Defendants argue Count Two of the Complaint fails to allege that they acted with the requisite scienter,

---

**18.** Section 10(b) prohibits the use of any instrumentality of commerce or facility of any national securities exchange in connection with a securities transaction that employs "any manipulative or deceptive device or contrivance." 15 U.S.C. § 78j(b).

**19.** Rule 10b–5 makes it unlawful to use an instrumentality of commerce or facility of a na-

tional securities exchange in connection with (a) the utilization of any device, scheme or artifice to defraud, (b) the assertion of any untrue statement or (c) omission of material fact and the participation in any act which would operate as a fraud or deceit upon any person in connection with the sale of a security. 17 C.F.R. 240.10b–5(a)–(c).

that the Plaintiffs reasonably relied on any manipulative or deceptive device employed by the Roberts Defendants, or that damage resulted therefrom.

### 1. *Scienter*

■ A claim alleging fraud must describe with particularity the facts upon which such claim is based. *Saporito v. Combustion Engineering, Inc.,* 843 F.2d 666, 673 (3d Cir.1988) *vacated on other grounds,* 489 U.S. 1049, 109 S.Ct. 1306, 103 L.Ed.2d 576 (1989). Rule 9(b) of the Federal Rules of Civil Procedure states:

> In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

*Id.* Scienter under Rule 10b–5, as a "condition of mind," may be averred generally to meet the pleading requirements of Rule 9(b). *Id.; see Kronfeld v. First Jersey Nat'l Bank,* 638 F.Supp. 1454, 1465 (D.N.J. 1986); *Alfaro,* 606 F.Supp. at 1105.

The requirements of Rule 9(b) are to be construed liberally. *Craftmatic Securities Litigation,* 890 F.2d at 645; *Christidis v. First Pennsylvania Mortgage Trust,* 717 F.2d 96, 100 (3d Cir.1983). Rule 9(b) must be harmonized with the flexibility permitted under Rule 8 of the Federal Rules of Civil Procedure. *Seville Indus. Machinery v. Southmost Machinery Corp.,* 742 F.2d 786, 792 (3d Cir.1984), *cert. denied,* 469 U.S. 1211, 105 S.Ct. 1179, 84 L.Ed.2d 327 (1985). That Rule requires a "short and plain statement" with each pleading being "simple, concise and direct." Fed.R.Civ.P. 8; *see Simcox v. San Juan Shipyard, Inc.,* 754 F.2d 430, 440 (1st Cir.1985) ("Rule 9 must be read in conjunction with Rule 8 which provides that a complaint should not be struck for the failure to follow a form if the nature of the claim is apparent.").

■ The particularity requirement of Rule 9(b) does not require that a complaint read like a laundry list of dates, times and persons involved in the underlying transaction. As the Third Circuit explained in *Seville:*

Rule 9(b) requires plaintiffs to plead with particularity the "circumstances" of the alleged fraud in order to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior. It is certainly true that allegations of "date, place or time" fulfill these functions, but nothing in the rule requires them. Plaintiffs are free to use alternative means of injecting precision and some measure of substantiation into their allegations of fraud.

742 F.2d at 791. As long as the Complaint sets forth enough information to provide factual support for Plaintiffs' allegations, it meets the standard set forth in *Seville.*

This is particularly true where the complaint involves allegations of corporate fraud where "plaintiffs cannot be expected to have personal knowledge of the details of corporate internal affairs." *Craftmatic Securities Litigation,* 890 F.2d at 645; *see Wool,* 818 F.2d at 1439. An overly restrictive reading of the requirements of Rule 9(b) would permit "sophisticated defrauders" to avoid liability if it is possible to conceal the details of their actions. *Craftmatic Securities Litigation,* 890 F.2d at 645. At a minimum the Plaintiffs must allege the information necessary to disclose the fraud lies within the control of the Roberts Defendants and such an allegation must be accompanied by "a statement of the facts upon which the allegations are based." *Id.*

■ A general allegation of scienter is sufficient to meet the requirements of Rule 9(b) of the Federal Rules of Civil Procedure in case under Rule 10b–5 of the 1934 Act. *Kronfeld,* 638 F.Supp. at 1465 (allegation that defendants "had actual knowledge of the materially false and misleading statements and omissions set forth above or acted with reckless disregard for the truth" is sufficient to meet general pleading requirements for Rule 10b–5 purposes); *Alfaro,* 606 F.Supp. at 1105 (conclusory allegation of scienter sufficient to meet pleading requirement of Rule 9(b) in Rule 10b–5 case). Count Two of the Complaint

states the Roberts Firm, "as managing underwriter for the public offering of the Hughes [Capital] Securities, had *actual knowledge* or in *reckless disregard* of the facts should have known of the Rule 10b-5 violations...." Complaint, ¶ 77. This allegation is sufficient to allege scienter on the part of the Roberts Firm. The Roberts Defendants argue, however, Count Two does not allege scienter of the individual Roberts Defendants because the Complaint does not set forth the roles of each individual Roberts defendant in the scheme to defraud, particularly as to Greenberg, Tucker and Weiss, who are never mentioned in the factual allegations of Counts One or Two.

Except as to Greenberg, the argument of the Roberts Defendants is rejected for two reasons. The first reason to reject the argument is that the Complaint, the conclusions of SEC in the Stop Order and the transcripts of the guilty pleas of defendants Reifler, Kanoff and Weiss contain more than enough information to put all of the Roberts Defendants, other than Greenberg, on notice of their alleged involvement in the scheme to defraud.

The Complaint bases the allegation that Fiorese, Galiardo and Perfetti had actual knowledge of the fraud on specific facts by reference to the Stop Order. Count Two explains the roles of Lieb and Kanoff in the fraudulent scheme. Greenberg, Tucker and Weiss are not mentioned in the Stop Order or the substantive allegations of the Complaint. The guilty plea transcript of Weiss, however, establishes his participation in and knowledge of the fraud. The plea transcript of Kanoff inculpates Tucker. The general allegation of scienter, coupled with the other information made available to the Roberts Defendants, is sufficient to put on notice all the Roberts Defendants except Greenberg.

The second reason to reject the argument of the Roberts Defendants is that the Plaintiffs should not be penalized because of attempts to cover up the involvement of the Roberts Defendants in this sophisticated fraud. *Craftmatic Securities Litigation*, 890 F.2d at 645. The SEC noted in

the Stop Order that subpoenas had been issued to six Roberts Defendants to testify regarding Hughes Capital; however, "[a]ll six of the individuals ... refused to produce documents or testify in response to subpoenas on the basis of various alleged constitutional privileges, including their Fifth Amendment privilege against self incrimination...." Richards Aff., Ex. H. This fact is echoed in paragraph 107 of the Complaint, which states: "Subsequent to August 25, 1986 and continuing until July 20, 1987, the named defendants willfully concealed their Rule 10b-5 violations from the named plaintiffs and other purchasers of Hughes [Capital] Securities." Complaint, ¶ 107. This is a case in which the Plaintiffs cannot reasonably be expected to know all the details of the scheme to defraud or the specific roles of the individual Roberts Defendants in the scheme. *Compare Insurance Consultants of America*, 746 F.Supp. at 411 (attempt to "paper over" financial problems nonexistent or ineffective).

As noted previously, neither the Complaint nor the extraneous affidavits submitted by the parties sets forth specific allegations against Greenberg. The lack of any evidence inculpating Greenberg in the fraud cannot be said to put him on notice of the claims against him. The Plaintiffs have failed to presented specific facts in support of the allegation that Greenberg had the requisite scienter to violate Rule 10b-5. The motion to dismiss is granted in favor of Greenberg with leave to the Plaintiffs to replead upon a more fully developed factual record, if appropriate and pursuant to Fed.R.Civ.P. 11.

The Roberts Defendants also argue the Complaint does not allege the requisite state of mind because it states the Roberts Firm failed to exercise reasonable diligence, suggesting negligent rather than intentional conduct, and such an allegation is insufficient to state a claim under Rule 10b-5. *McClean v. Alexander*, 599 F.2d 1190, 1198 (3d Cir.1979) ("negligence—whether gross, grave or inexcusable—cannot serve as a substitute for scienter"). The Complaint states:

Under securities industry standards applicable to underwriters, [the Roberts Firm] had a due diligence responsibility to ascertain whether the Hughes Registration Statement was false and misleading, whether the offer and sale of the Hughes [Capital] Securities was a bona fide public offering and whether post-effective amendments to the Hughes Registration Statement were required to be filed to reflect material events.

Complaint, ¶ 77.

This allegation does not render immaterial the extensive allegations of the Complaint which set forth an intentional and methodical scheme to commit fraud in the sale of Hughes Capital securities. The facts of the scheme and the roles of the individual Roberts Defendants are recorded at length in the Stop Order and in the plea testimony of Reifler, Kanoff and Weiss, which have been submitted as part of this motion. Rule 8 of the Federal Rules of Civil Procedure provides that a party may plead alternative or inconsistent claims and when "one of them if made independently would be sufficient, the pleading is not made insufficient by the insufficiency of one or more of the alternative statements." Fed.R.Civ.P. 8(e)(2). Accordingly, the allegation of negligence by the Roberts Firm is not fatal to the particular allegations of the Complaint which state intentional or reckless conduct. The motion of the Roberts Defendants will therefore be denied as it relates to the issue of scienter, except as to Greenberg.

### 2. *Manipulative or Deceptive Device*

■ The Roberts Defendants argue the Complaint fails to allege the use of any manipulative or deceptive device. They claim the Plaintiffs allege a "host of manipulative acts" by Hughes Capital but "these acts are alleged to have occurred before [the Roberts Firm] became associated with the Hughes [Capital] securities or after [the Roberts Firm] ceased to be associated with the securities." Roberts Defendants' Brief at 19. In support of their claims, the Roberts Defendants rely on the Weiss Affidavit, which states the Roberts Firm ceased to act as underwriter for Hughes Capital in December 1986.

The Complaint states:

Among the devices, schemes and artifices to defraud employed by defendants in violation of paragraph (a) of Rule 10b–5 was to deceive the SEC and state securities agencies in allowing the Hughes Registration Statement to become effective although it failed to comport with federal and state registration requirements. In addition, the defendants failed to disclose they intended to utilize the device of illegally "parking" shares of Hughes [Capital] Securities. That is by means of the sale of at least eighty-eight percent (88%) if Hughes [Capital] Securities to defendants Reifler, Beall, LaChance, Victor, John Doe and Richard Roe, Inc. rather than to *bona fide* members of the public, defendants intended to and did in fact control and manipulate the price for Hughes Securities in the aftermarket.

Complaint, ¶ 74.

As with the other motions at issue, the actions of the individual Roberts Defendants are set forth at length in the plea transcripts of Reifler, Kanoff and Weiss. The role of the Roberts Firm generally is set forth in the Complaint and the Stop Order of the SEC. These facts establish that the Roberts Defendants knowingly participated in a scheme to purchase the entire initial public offering of Hughes Capital for the nominee accounts, despite the representation in the Hughes Registration Statement that the Roberts Firm was acting as underwriter on a best-efforts, all or none basis. In addition, the Roberts Firm artificially created and dominated the market for Hughes Capital securities in the Aftermarket by disseminating to their customers and the public false and misleading statements through the Hughes Registration Statement and press releases. These facts adequately demonstrate the existence of a manipulative or deceptive device.

### 3. *Reliance*

Reliance is an essential element of a Rule 10b–5 case. *Basic Inc. v. Levinson*, 485 U.S. 224, 243, 108 S.Ct. 978, 989, 99 L.Ed.2d

194 (1988) (citing *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 206, 96 S.Ct. 1375, 1387, 47 L.Ed.2d 668 (1976)). "Under the federal securities laws, investors are charged with knowledge of information of which they reasonably should have been aware." *Warner Communications, Inc. v. Murdoch*, 581 F.Supp. 1482, 1492 (D.Del. 1984). The reliance and causation requirements of Rule 10b–5 prevent it from becoming a private enforcement mechanism or a system of investor insurance. *Ross v. Bank South, N.A.*, 885 F.2d 723, 729 (11th Cir.1989) (en banc), *cert. denied*, — U.S. ——, 110 S.Ct. 1924, 109 L.Ed.2d 287 (1990); *List v. Fashion Park, Inc.*, 340 F.2d 457, 463 (2d Cir.), *cert. denied*, 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965).

Traditionally, reliance is established by "proof that the misrepresentation or omission actually induced the plaintiff to act differently than he would have acted in his investment decision." *St. Louis Univ. Trust Co. v. Merrill Lynch, Pierce, Fenner & Smith*, 562 F.2d 1040, 1048 (8th Cir.1977), *cert. denied*, 435 U.S. 925, 98 S.Ct. 1490, 55 L.Ed.2d 519 (1978). *Accord Peil v. Speiser*, 806 F.2d 1154 (3d Cir.1986); *List*, 340 F.2d at 463. Actual reliance on the specific misrepresentation at issue is often difficult to prove. Accordingly, courts have developed rules under which reliance may be presumed in certain circumstances.

■ Where proof of actual reliance is unavailable due to a failure to disclose information, "[a]ll that is necessary is that the facts withheld be material in the sense that a reasonable investor *might* have considered them important in the making of his decision." *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153–54, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972) (emphasis in original); *see Basic Inc.*, 485 U.S. at 245, 108 S.Ct. at 990; L.

Loss, *Fundamentals of Securities Regulation* 959 (1988). This rule may be traced to the holding of *Mills v. Electric Auto–Lite Co.*, 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970), in which the Supreme Court determined that in a proxy solicitation, a voting shareholder need not allege or prove actual reliance on an omission to make out a claim under section 14(a) of the 1934 Act.[20] The *Mills* Court stated:

> Where there has been a finding of materiality, a shareholder has made a sufficient showing of causal relationship between the violation and the injury for which he seeks redress if, as here, he proves that *the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction.* This objective test will avoid the impracticalities of determining how many votes were affected, and, by resolving doubts in favor of those the statute is designed to protect, will effectuate the congressional policy of ensuring that the shareholders are able to make an informed choice when they are consulted on corporate transactions.

*Id.* at 385, 90 S.Ct. at 622 (emphasis added).

The Plaintiffs argue they are entitled to a presumption of reasonable reliance on the omissions of the Hughes Registration Statement because the omitted facts were material to the investment decisions of the Plaintiffs. *Affiliated Ute Citizens*, 406 U.S. at 154, 92 S.Ct. at 1472. The Roberts Defendants argue, however, it was unreasonable to rely on the Hughes Registration Statement after 13 February 1987, when the SEC issued the Suspension Order and warned potential investors in Hughes Capital that adequate information appeared unavailable.

While reliance should be presumed only when it is reasonable and logical to do so,

---

20. Section 14 of the 1934 Act deals with the solicitations of proxies. 15 U.S.C. § 78n. Section 14 makes it unlawful:

for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading or

to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation.

*Id.* § 78n(e).

*Zlotnick,* 836 F.2d at 822, the omissions from the Hughes Registration Statement and the resultant false portrayal of the company as a valid entity are of sufficient materiality that they may raise the rebuttable presumption of reasonable reliance on the part of the Plaintiffs. In addition, as noted in the discussion on the statute of limitations issue *supra,* the failure of the Plaintiffs to discover the fraud before issuance of the Stop Order was not unreasonable as a matter of law. It follows that whether reliance was reasonable after the issuance of the Suspension Order is a genuine issue of material fact.

Wiley and Moraglia admit they did not read the Hughes Registration Statement prior to purchasing Hughes Capital securities in the Aftermarket. Richards Aff, Exs. A & B (Answers to Interrogatory Number 47(a)). This admission does not entitle the Plaintiffs to the presumption of reasonable reliance on the Hughes Registration Statement. The absence of a causal link between the omissions of the defendants and plaintiff's purchase of the securities at issue is fatal to a Rule 10b–5 claim. *Ross,* 885 F.2d at 728; *Shores v. Sklar,* 647 F.2d 462, 468 (5th Cir.1981) (en banc), *cert. denied,* 459 U.S. 1102, 103 S.Ct. 722, 74 L.Ed.2d 949 (1983). Therefore, the Plaintiffs must demonstrate some other form of reliance to survive this summary judgment motion.[21]

The Plaintiffs argue the reliance element of their 10b–5 claim may be presumed because the sale of Hughes Capital securities was a "fraud on the market." In *Peil v.*

*Speiser, supra,* the Third Circuit held the showing of a fraud on the market may create a rebuttable presumption of reliance by the plaintiff in certain cases. *Id.* at 1161; *Cammer,* 711 F.Supp. at 1276. The *Peil* court stated:

> [P]laintiffs who purchase in an *open and developed market* need not prove direct reliance on defendant's misrepresentations, but can satisfy their burden of proof on the element of causation by showing that the defendants made material misrepresentations. If plaintiffs make such a showing, the court will presume that the misrepresentations occasioned an increase in the stock's value that, in turn, induced the plaintiffs to purchase the stock.

*Peil,* 806 F.2d at 1160–61 (emphasis added).

Following *Peil,* the Supreme Court adopted the fraud on the market theory as a substitute for actual reliance on misrepresentations allegedly made in an offering prospectus or other public information. *Basic Inc.,* 485 U.S. at 241–42, 108 S.Ct. at 988–89. Writing for the *Basic* Court, Justice Blackmun noted the necessity of creating presumptions of reasonable reliance in the field of securities fraud:

> Requiring a plaintiff to show a speculative state of facts, *i.e.,* how he would have acted if omitted material information had been disclosed, see *Affiliated Ute Citizens v. United States,* 406 U.S., at 153–54, 92 S.Ct., at 1472, or if the misrepresentation had not been made, see *Sharp v. Coopers & Lybrand,* 649

---

**21.** The interrogatory answers of Wiley indicate he first heard of Hughes Capital securities from a broker at the Roberts Firm. Richards Aff, Ex. A (Answer to Interrogatory Number 20). Moraglia first learned of Hughes Capital from a broker at another firm. *Id.,* Ex. B. These conversations with brokers were significant factors in the Plaintiffs' individual decisions to purchase Hughes Capital. *Id.,* Exs. A & B (Answers to Interrogatory Number 22).

A securities plaintiff may demonstrate reliance by demonstrating his investment decision was based on the advice of a broker who conveyed the fraudulent or misleading information at issue. A. Jacobs, 5A *Litigation and Practice Under Rule 10b–5* § 64.01[b][ii] at 3–332 to 3–333 (2d ed. 1990) ("[Plaintiff] can ... recover if his stockbroker or agent sees the release, recom-

mends that plaintiff trade because of the release, and the plaintiff then buys or sells in reliance on the recommendation.") (collecting citations).

The record does not reveal whether the brokers who recommended the purchase of Hughes Capital to the named Plaintiffs considered the Hughes Registration Statement or other fraudulent releases in connection with the recommendation. Because Wiley's broker was employed by the Roberts Firm, there exists a genuine issue of material fact on this point. Although the argument is not raised by Plaintiffs, if they can demonstrate the brokers did in fact consider the fraudulent documents issued by Hughes Capital and based their recommendations to buy on that information, then reliance may be established.

F.2d 175, 188 (CA3 1981), cert. denied, 455 U.S. 938, 102 S.Ct. 1427, 71 L.Ed.2d 648 (1982), would place an unnecessarily unrealistic evidentiary burden on the Rule 10b–5 plaintiff who has traded on an impersonal market. Cf. *Mills v. Electric Auto–Lite Co.*, 396 U.S., at 385, 90 S.Ct., at 622.

*Id.* 485 U.S. at 245, 108 S.Ct. at 990. The Court held: "Misleading statements will ... defraud purchasers of stock [on an open and developed market] even if the purchasers do not directly rely on the misstatements." *Id.*

The Third Circuit reaffirmed the validity of the fraud on the market theory in *Zlotnick v. TIE Communications, supra.* As applied in the Third Circuit, the fraud on the market theory requires that the securities trade in an open and developed market, the reason being that such markets are efficient and pricing is directly effected by the dissemination of misleading information. *Peil,* 806 F.2d at 1160. The theoretical underpinning of the fraud-on-the-market theory may be stated simply: "Because the market price has been affected by fraud, that price is—at least to the extent it is artificially inflated—a misrepresentation." *Zlotnick,* 836 F.2d at 822. An investor who purchases a stock based upon its price in an open and developed market reasonably relies on the misrepresentation because he reasonably relies on the price of the stock to determine its value.

In this case, the Plaintiffs have failed to allege or present facts sufficient to raise the inference that Hughes Capital securities were traded on an open and developed market. *Cf. Cammer,* 711 F.Supp. at 1286–87 (setting forth indicia which may raise inference of efficient market). The market for Hughes Capital securities is alleged to have been dominated by the Roberts Firm at least through December 1986. As a direct participant in the scheme to defraud described in the Complaint, it is not possible to conclude the Roberts Firm, as market maker of Hughes Capital, "provided a sufficiently fluid and informed trading environment" such that the price of the securities would have accurately reflected their value. *Id.* at 1282. The Plaintiffs cannot proceed under a traditional fraud on the market theory.

The Third Circuit has not considered whether the fraud on the market theory holds for newly-issued stocks which are traded in undeveloped securities markets. *Cf. Peil,* 806 F.2d at 1161 n. 10 ("While this presumption [of fraud on the market] is plausible in developed markets, it may not be in the case of newly issued stock."). Some courts, however, have permitted such a presumption to adhere in cases where plaintiffs purchased newly-issued securities without reading the offering circular or similar disclosure documents. For example, the Eleventh Circuit recently held:

> When the fraud alleged is so pervasive that absent the fraud the [securities] could not have been marketed, the reliance element is established by the buyer's reliance on the integrity of the market, i.e., the action of the market to furnish only securities that are entitled to be marketed.

*Ross,* 885 F.2d at 729; *see also* cases discussed *infra.* The presumption of reliance in such cases is based on the notion that an investor may reasonably rely on the integrity of any market, even an undeveloped or inefficient one, to drive out securities which are "so tainted by fraud as to be totally unmarketable." *Id.*

The seminal case on the so-called "fraud created the market" presumption is *Shores v. Sklar, supra.* In *Shores,* the plaintiffs alleged the existence of a fraudulent scheme to induce a municipality to issue otherwise unmarketable industrial revenue bonds. 647 F.2d at 462. The defendants had induced the municipality to issue the bonds to finance the development of a property which would be rented to the defendants. The amortization of the bonds depended entirely on income from rent.

The plaintiffs alleged the defendants had persuaded the municipality to undertake the bond issuance by falsely representing, among other things, financial integrity of the defendants, the suitability of the property for development and their experience in the development business. Almost im-

mediately after taking possession of the property, the defendants defaulted in rent payments and the municipality lost the ability to amortize the bonds. *Id.* at 465–67.

The *Shores* court determined that "the fraudulent scheme alleged by [the plaintiffs] was so pervasive that without it the issuer would not have issued, the dealer could not have dealt in, and the buyer could not have bought these Bonds, because they would not have been offered on the market at any price." *Id.* at 464 n. 2. The existence of a fraud so pervasive as to undermine the validity of the bonds rendered plaintiff's lack of reliance on the offering circular or any other document immaterial to the Rule 10b–5 claim. *Id.* at 471. The *Shores* court held this allegation was sufficient to establish reliance as an element of the Rule 10b–5 claim.

 The plaintiff alleging a *Shores* theory of reliance must prove:

(1) the defendants knowingly conspired to bring securities onto the market which were not entitled to be marketed, intending to defraud purchasers, (2) [plaintiff] reasonably relied on the [securities'] availability on the market as an indication of their apparent genuineness, and (3) as a result of the scheme to defraud, [plaintiff] suffered a loss.

*Id.* at 469–70 (footnote omitted). The presumption of reliance may be rebutted only by demonstrating "an individual plaintiff purchased despite knowledge of the falsity of a representation, or that he would have, had he known of it." *Blackie v. Barrack,* 524 F.2d 891, 906 (9th Cir.1975), *cert. denied,* 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976).

The rule of *Shores* applies to inefficient markets, in effect disposing of the efficient market hypothesis and adopting a presumption that it is reasonable in any market for a buyer to "rel[y] on the integrity of the market to furnish securities which were not the product of a fraudulent

scheme." 647 F.2d at 471. This theory dispenses with the requirement that a security must trade on an open and developed market, which is essential to the theoretical underpinning of the fraud on the market presumption. *Basic Inc.,* 485 U.S. at 245, 108 S.Ct. at 990. In this way, the fraud created the market doctrine is more than a departure from fraud on the market doctrine, it is a new species of reliance theory.

As noted previously, the Third Circuit has not spoken on the fraud created the market theory. In *Stinson v. Van Valley Dev. Corp.,* 719 F.Supp. 362 (E.D.Pa.1989), *aff'd mem.,* 897 F.2d 524 (1990), the Third Circuit affirmed, without discussion, a district court dismissal of a complaint under the fraud created the market theory because the plaintiff had not alleged the securities at issue were "patently worthless." *Id.* at 366. The *Stinson* court held:

While investors cannot be said to reasonably rely on market mechanism to reflect an accurate price in illiquid and undeveloped markets, reliance on market integrity to reflect the basic marketability of a security is not so unlikely.... In such cases, it is reasonable to presume that an investor would actually rely on the integrity of an illiquid market to reflect such a fundamental characteristic.

*Id.* at 365–66 (footnote omitted).[22]

The affirmance of the district court decision in *Stinson* does not necessarily establish that the Third Circuit would adopt the *Shores* presumption. In *Zlotnick,* the Third Circuit held that an investor could not maintain an action under section 10(b) against defendants whose alleged misrepresentations artificially inflated the price of a stock which the plaintiff had sold short. 836 F.2d at 823. The court drew a clear distinction between allegations of "[r]eliance on the integrity of the *market* in a stock [and].... reliance on the integrity of the market *price* in that stock." *Id.* (emphasis in original). While recognizing that the reliance upon the price as an accurate

---

**22.** Another district court has determined that *Stinson*—and the fraud created the market theory of *Shores*—are controlling precedent in this Circuit. *In re Bexar County Health Facility Dev. Corp.,* 130 F.R.D. 602, 609 (E.D.Pa.1990). *But* *see Desfor v. National Housing Ministries,* No. 84–1562, 1986 WL 12031 (E.D.Pa. 23 Oct.1986) (expressing disbelief that Third Circuit would accept fraud on the market theory in undeveloped market context).

representation of the worth of a stock (i.e., market "efficiency") is supported by the efficient market hypothesis, the Third Circuit held that reliance upon the ability of investors to respond correctly to future information concerning a stock (i.e., market "integrity") is not reasonable. *Cf.* Note, *Fraud-on-the-Market Theory After Basic Inc. v. Levinson,* 74 Cornell L.Rev. 964, 983 (1989) (arguing that *Shores* misconstrued the fraud on the market theory because "a market will have integrity ... only when a security's value is reflected in its price").

Were the *Shores* doctrine based entirely upon the efficient market hypothesis, the analysis would end here. It is almost universally recognized that *Shores* cannot be based upon the efficiency of markets because its rule applies in the context of newly-issued securities for which there is no established market.[23] Based upon the dictum of *Zlotnick*, the fraud created the market hypothesis could be rejected out of hand. As noted previously, however, the fraud created the market presumption is not merely an extension of the efficient market hypothesis to inefficient markets, it is a new species of reliance theory.

The element of the *Shores* doctrine which its detractors frequently overlook is the average investor's reliance on the mix of factors which make up the "integrity" of the market. These factors include not only the efficiency of the market in the traditional theoretical sense, but also the regulatory system and the representations of promoters of securities. The *Shores* doctrine presumes it is reasonable for an average investor to rely on these forces to preclude issuance of securities "where the promoters knew that the subject enterprise was worthless when the securities were issued,

and successfully issued the securities only because of defendants' fraudulent scheme." *Abell v. Potomac Ins. Co.,* 858 F.2d 1104, 1122–23 (5th Cir.1988), *vacated on other grounds sub nom. Fryar v. Abell,* —— U.S. ——, 109 S.Ct. 3236, 106 L.Ed.2d 584 (1989).

The inquiry focuses on whether the securities were "entitled to be marketed," not merely on whether they were theoretically marketable in a purely financial sense. *Id.* at 1121. As noted by the *Shores* court:

> The securities laws allow an investor to rely on the integrity of the market to the extent that the securities it offers to him for purchase are *entitled to be in the market place.*

647 F.2d at 471 (emphasis added). The reliance in that instance is on the securities laws and the benefits of purchasing newly issued securities in a regulated market, rather than merely the efficiency of an open and developed market.

This view of the fraud created the market theory holds that a security may have some economic value, but still be patently worthless. The Fifth Circuit has rejected the argument that "worthlessness" within the meaning of *Shores* requires the subject corporation to be devoid of assets.

> This argument misses the point, since saleable assets may bless even the most worthless enterprise. In *Shores*, the illegitimate securities represented an investment in a hoax made to seem real because valuable assets, including a factory, backed the promoters' promises. Although the assets may have added value to the securities, the sham "business" did not because the promoters never intended to start a legitimate one.

---

**23.** For authorities criticizing the *Shores* fraud created the market theory for its lack of adherence to the efficient market hypothesis, see, e.g., Macey & Miller, *Good Finance, Bad Economics: An Analysis of the Fraud-on-the-Market Theory,* 42 Stanford L.Rev. 1059, 1060 n. 5 (1990) (*Shores* is "the most striking example of the misapplication of finance theory" and "the idea that some securities are inherently unmarketable at any price is essentially meaningless in almost all cases."); *see also* Comment, *The Fraud on the Market Theory: The Debate Rages On,* 27 Duq.L.Rev. 277, 293 (1989); Note, *Dredging the Shores Doctrine: Trends in the Fraud-on-the-Market Theory in the New Issues Context,* 23 Ga.L.Rev. 731, 758–62 (1989) Note, *Fraud-on-the-Market Theory After Basic Inc. v. Levinson,* 74 Cornell L.Rev. 964, 983 (1989); Comment, *Rule 10b–5 Securities Fraud: Regulating the Application of the Fraud-on-the-Market Theory of Liability,* 18 J. Marshall L.Rev. 733, 748 (1985); Note, *The Fraud–On–The–Market Theory,* 95 Harv.L.Rev. 1143, 1157–58 (1982).

*Abell,* 858 F.2d at 1122. It is, therefore, the combination of economic worthlessness, knowledge of that fact by the stock's promoters and the resultant reliance by the investor on the existence of the security in a regulated market to be a representation of its legitimacy which comprise the fraud created the market theory. *See, e.g., T.J. Raney & Sons, Inc. v. Fort Cobb, Oklahoma Irrigation Fuel Auth.,* 717 F.2d 1330, 1333 (10th Cir.1983) (application of *Shores* approved where securities were unlawfully issued pursuant to fraudulent scheme), *cert. denied,* 465 U.S. 1026, 104 S.Ct. 1285, 79 L.Ed.2d 687 (1984).

In *Ross v. Bank South, N.A., supra,* the Eleventh Circuit reconsidered en banc the rule of *Shores v. Sklar.* In *Ross,* high yield revenue bonds were issued through a municipal authority to finance the development of retirement and nursing home facilities. As repayment of the bonds depended upon receipt of occupancy fees, collection of pre-sale deposits was integral to the viability of the financing. Subsequent to the issuance, the defendants were unable to sell sufficient units and the municipality was unable to repay the bonds. Unlike *Shores,* however, some revenues were received and some payments were made to bondholders.

A narrow majority of the en banc *Ross* court found that the defendants' failure to disclose inflated pre-sale prices, inadequate deposits and unrealistic projections on occupancy rates did not state the degree of fraud required under *Shores* because the plaintiff could not allege as a matter of law that the bonds were unmarketable in the sense that they could not be marketed at any price. *Ross,* 885 F.2d at 730–31.

Emphasizing the narrowness of the *Shores* fraud created the market theory, the *Ross* majority explained the rare instances in which the *Shores* presumption may be available:

> The burden imposed by the first element [of *Shores* ] is a substantial one. *Shores* is based on the understanding that although it is reasonable to rely on the market to screen out securities that are so tainted by fraud as to be totally un-marketable, investors cannot be presumed to rely on the primary market to set a price consistent with the appropriate risk.

*Id.* at 729.

The *Ross* court stressed that under *Shores* the fraud must be "so pervasive that it goes to the very existence of the bonds and the validity of their presence in the market." *Id.* The majority also held that the plaintiff must demonstrate the defendants knew the bonds were unmarketable, or acted in reckless disregard, and decided to issue them with the intent to defraud the public. *Id.* at 729–30. If the plaintiff "proves no more than that the bonds would have been offered at a lower price or a higher rate, rather than that they would never have been issued or marketed, he cannot recover." *Shores,* 647 F.2d at 470.

The concurring opinion of Judge Tjoflat characterized the majority's holding as an "economic unmarketability" test under which the plaintiff must show the securities were unmarketable in the sense that they could not be sold at any price or interest rate. *Ross,* 885 F.2d at 735 (Tjoflat, J., concurring). Concurring in the judgment of the majority, but calling for the overruling of *Shores v. Sklar,* Judge Tjoflat challenged the validity of the economic unmarketability test, arguing it is theoretically possible to market nearly any security at some combination of price and interest. *Id.* at 736. Judge Tjoflat further argued it would be unreasonable for investors in a primary market to rely on the judgment of biased—or perhaps dishonest—promoters and issuers to exclude an unmarketable stock from the market. *Id.* at 740 (Tjoflat, J., concurring).

He argued, however, if *Shores* is to be followed, the appropriate test should be one of factual unmarketability, not economic unmarketability:

> Marketability, as envisioned by the *Shores* court, is an elusive concept. The court failed to specify whether the marketability test should apply to the securities that were actually issued or to some theoretical security that could be issued

at any combination of price and interest rate. If the former interpretation is correct, then we should determine whether in the absence of fraud, the bonds would have been issued *given the actual price and interest rate at which they were issued.*

*Id.* at 735. Other dissenting and concurring judges appeared to agree with Judge Tjoflat that factual unmarketability should be sufficient to state a claim under *Shores*. *Id.* at 750 (Clark, J., concurring) (relevant inquiry should be factual); *see also id.* at 745 (Kravitch, J., dissenting); *id.* at 746 (Johnson, J., dissenting); *id.* at 747 (Hatchett, J., dissenting).

It appears from the foregoing discussion that the *Shores* decision spurred two distinct lines of cases, both of which uphold the fraud created the market theory on different grounds. Under the majority opinion of the Eleventh Circuit in *Ross,* the *Shores* doctrine is limited to instances in which a security is economically unmarketable in that it is valueless at any combination of price and interest rate. Under the factual unmarketability test of Judge Tjoflat in *Ross* and the Fifth Circuit in *Abell,* the *Shores* doctrine applies to cases in which the security, although it may have had some economic worth, was subject to fraud which was so pervasive as to undermine its genuineness and render it unworthy of trading in a regulated securities market. While courts and commentators have recognized that the *Shores* doctrine is unsupportable as an extension of the efficient market hypothesis, fraud created the market theory has received continuing vitality from the adoption of the factual unmarketability concept.

Given that the Third Circuit has recognized the futility of applying the efficient market hypothesis to claims of reliance on the "integrity of the market," *Zlotnick,* 836 F.2d at 823, it appears reliance under

the fraud created the market theory must involve more than economic unmarketability.[24] The factual unmarketability test of Judge Tjoflat and the *Abell* court appears to be the more appropriate test to apply to the instant case. *Cf.* Note, *Dredging the Shores Doctrine: Trends in the Fraud-on-the-Market Theory in the New Issues Context,* 23 Ga.L.Rev. 731, 758–61 (1989) (arguing for an alternative fraud created the market exception in which investors may rely on the mix of regulatory and market forces to exclude fraudulent new issuances); *But see In re Bexar County,* 130 F.R.D. at 609–10 (rejecting factual unmarketability test).

On the basis of the record as it now stands, the initial public offering of Hughes Capital securities appears to have been so riddled with fraud that there would have been no market for the securities absent the fraud, in which the Roberts Defendants (except Greenberg) were culpable participants. The Complaint states:

The acts, practices, transactions and course of business engaged in by the named defendants as aforesaid, constitute a massive fraud on the market which, if disclosed, as reflected in the July 20, 1987 [S]top [O]rder of the SEC incorporated and made a part of this [C]omplaint, *would have prevented the Hughes Registration Statement from becoming effective under federal and state registration statutes.* But for defendants' scheme to defraud investors, neither of the named plaintiffs nor any other member of the putative class would have purchased the Hughes Securities and suffered damages for which they seek relief by way of this [C]omplaint.

Complaint, ¶ 81 (emphasis added).[25]

The Plaintiffs have presented sufficient evidence of the non-viability of Hughes

---

**24.** Such a conclusion would not be appropriate in circumstances other than a new issuance of securities. The *Zlotnick* court rejected a theory of reliance on the integrity of the market to respond to information concerning a previously issued stock. 836 F.2d at 823. In the context of a newly issued security, however, reliance is

based not only on market forces but on the factors previously discussed.

**25.** This allegation alone would satisfy the factual unmarketability test described by Judge Tjoflat in *Ross:*

Under [the factual unmarketability] interpretation, a bond is unmarketable if, but for the

Capital. They have asserted there were no assets of the corporation beyond the funds obtained from the fraudulent issuance of Hughes Capital securities; the acquisition targets are alleged to be worthless companies and Hughes Capital had not obtained letters of credit or other financial assistance for the alleged plan to acquire the target companies. Moreover, the only potential assets of Hughes Capital, the targeted acquisition companies, were owned or controlled by officers or directors of Hughes Capital. While even extraordinarily risky investments may be marketable at some combination of price and interest rate, it is inconceivable that a reasonable investor would purchase stock in a corporation which has no legitimate business purpose and which contains no assets, or the only assets of which are worthless acquisition targets owned by the principals of the holding corporation.

Simply stated, the Plaintiffs have presented sufficient support for their allegations that the initial public offering of Hughes Capital was the product of a fraudulent scheme such that the stock would not have existed, been issued or been purchased but for the intentionally fraudulent conduct of the Roberts Defendants. It cannot be said on the basis of the record before the court, viewing all the factual inferences in a light favorable to the Plaintiffs, that it was unreasonable for them to rely on the existence of Hughes Capital securities in the market to be a representation of their entitlement to be marketed. In this case, it appears there would have been no market for Hughes Capital securities but for the fraud. The motion of the Roberts Defendants for summary judgment is therefore denied.

### 4. *Causation*

■ In an allegation of fraud in the sale of securities, courts in this Circuit have differentiated between transaction causation and loss causation. *Rubin v.*

*Posner,* 701 F.Supp. 1041, 1046–47 (D.Del. 1988); *Hartman v. Blinder,* 687 F.Supp. 938, 944–45 (D.N.J.1987); *In Re Catanella,* 583 F.Supp. 1388, 1414 (E.D.Pa.1984).

Transaction causation is the term applied when the misrepresentation causes plaintiff to enter the transaction. *In Re Catanella,* 583 F.Supp. at 1414. It is "but for" causation; in other words, the misrepresentation caused the purchase of stock but not the decline in value of the stock. *Hartman,* 687 F.Supp. at 943. Transaction causation is merely another term for reliance. *Harris v. Union Elec. Co.,* 787 F.2d 355, 366 (8th Cir.), *cert. denied,* 479 U.S. 823, 107 S.Ct. 94, 93 L.Ed.2d 45 (1986). As noted, Plaintiffs have submitted sufficient factual data to establish reliance.

Loss causation occurs when the misrepresentation or omission itself is the proximate cause of the loss. *Huddleston v. Herman & Maclean,* 640 F.2d 534 (5th Cir.1981), *rev'd in part on other grounds,* 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983); *Rubin,* 701 F.Supp. at 1047. A plaintiff claiming fraud in a securities transaction must plead both transaction and loss causation. *Rubin,* 701 F.Supp. at 1046–47. This is not a hypertechnical pleading error. As was noted by both Judge Giles in *In Re Catanella* and Judge Barry in *Hartman,* ignoring the distinction between transaction causation and loss causation would transform the defendant into an insurer of the stock, a result which is contrary to the purpose of the federal securities laws. *See Hartman,* 687 F.Supp. at 944; *In Re Catanella,* 583 F.Supp. at 1417.

The Third Circuit has not addressed the transaction/loss causation distinction directly. However, in explaining the requirements of a Section 10(b) and Rule 10b–5 action the Circuit has stated: "The misrepresentations must touch upon the reasons for the investment's decline in value." *In re Phillips Petroleum Securities Litiga-*

---

fraudulent scheme, some "regulatory" entity (whether official or unofficial) would not have allowed the bond to come onto the market at its actual price and interest rate. ... Even an extraordinarily risky security is entitled to be marketed; but a security that pre-

sumably would never have been issued by an entity but for the fraud is not "entitled" to be on the market.

*Ross,* 885 F.2d at 736 (emphasis and footnotes omitted).

*tion,* 881 F.2d 1236, 1244 (3d Cir.1989) (citing *Huddleston* ). This is the very definition of loss causation, that the fraud caused the decline in value rather than merely inducing the transaction. *Bloor v. Carro, Spanbock, Londin, Rodman & Fass,* 754 F.2d 57, 61 (2d Cir.1985).

█ In this case, the submissions before the court establish both transaction causation and loss causation. The Plaintiffs have submitted facts and allegations which, drawing all inferences favorable to Plaintiffs' case, establish that the massive scheme of the Roberts Firm and the individual Roberts Defendants to defraud the public was not only related to the losses of the Plaintiffs but also was the sole reason for those losses.

If it were not for the fraud of the Roberts Defendants, taking the allegations and factual submissions of the parties as true, the Plaintiffs would not have purchased Hughes Capital securities. Indeed, the securities would not have been available for purchase by the Plaintiffs because Hughes Capital had no assets and no viable business purpose. The marketing of inherently unmarketable securities by the Roberts Defendants was the cause of the Plaintiffs' loss. Therefore, the securities claims under the 1934 Act will not be dismissed on the record presented in connection with these motions.

### D. *Claims Under RICO*

Count Seven alleges the Roberts Defendants aided and abetted the other named defendants in violation of section 1962(b) of RICO,[26] or conspired with the other defen-

dants to violate that section, thereby subjecting themselves to liability as co-conspirators under section 1962(d) of RICO.[27] The Roberts Defendants argue Count Seven should be dismissed because Plaintiffs have not alleged the substantive elements of aider and abettor liability pursuant to section 1962(b) or for a conspiracy under section 1962(d).

Plaintiffs assert violations of section 1962(c) of RICO [28] in Count Eight of the Complaint. 18 U.S.C. § 1962(c). The Roberts Defendants argue Count Eight should be dismissed because the Plaintiffs do not allege facts sufficient to make out a substantive violation of RICO.

█ The existence of a substantive violation of RICO requires a showing that the defendants conducted (1) an enterprise (2) through a pattern (3) of racketeering activity. *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 497–98, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985); *Marshall–Silver Constr. Co. v. Mendel,* 835 F.2d 63, 65 (3d Cir.1987), *vacated on other grounds,* —— U.S. ——, 109 S.Ct. 3233, 106 L.Ed.2d 582 (1989) (*"Marshall–Silver I "*). Each of these elements must be alleged to state a claim under RICO.[29] *Sedima,* 473 U.S. at 496, 105 S.Ct. at 3285. Injury to business or property is necessary to confer standing upon a private plaintiff. *Sedima,* 473 U.S. at 496, 105 S.Ct. at 3285; *Keystone Ins. Co. v. Houghton,* 863 F.2d 1125, 1129 (3d Cir.1988); *Marshall–Silver I,* 835 F.2d at 65.

The Supreme Court has indicated RICO is to be read broadly "to effectuate its remedial purposes." *Sedima,* 473 U.S. at

---

**26.** Section 1962(b) states:

It shall be unlawful for any person through a pattern of racketeering activity ... to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in ... interstate or foreign commerce.

18 U.S.C. § 1962(b).

**27.** Section 1962(d) of RICO states it is unlawful for any person to conspire to violate any of the other subsections of RICO. 18 U.S.C. § 1962(d).

**28.** Section 1962(c) makes it unlawful for any person:

employed by or associated with any enterprise engaged in ... interstate or foreign com-

merce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity....

18 U.S.C. § 1962(c).

**29.** The same elements must be proved for a civil RICO action as for a criminal action, but the standard of proof in the civil action is a preponderance of the evidence, while a conviction under RICO requires proof beyond a reasonable doubt. *McClendon v. Continental Group, Inc.,* 602 F.Supp. 1492, 1511 (D.N.J.1985); *Eaby v. Richmond,* 561 F.Supp. 131, 134 (E.D.Pa.1983).

497–98, 105 S.Ct. at 3286. Complaints alleging RICO violations are held to a liberal pleading standard. *Rose v. Bartle,* 871 F.2d 331, 356 (3d Cir.1989). However, the Plaintiffs' claims must be alleged with sufficient clarity under Rule 9(b).

Although the requirements of Rule 9(b) are interpreted liberally, each element of a RICO claim must be presented with detail sufficient to put the defendant on notice of the claims against him. *Saporito,* 843 F.2d at 673. This requirement of particularity also serves "to demonstrate plaintiffs have investigated the alleged fraud and reasonably believe a wrong has occurred." *Kronfeld,* 638 F.Supp. at 1465. As noted in the discussion of scienter for purposes of Rule 10b–5, the allegations of the Complaint and other extraneous material submitted in conjunction with these motions are sufficient to put the Roberts Defendants except Greenberg on notice of the claims against them for purposes of Rule 9(b). Thus, the analysis turns to whether the allegations constitute viable claims under RICO.

### 1. *Aider/Abettor Liability and Conspiracy*

 The Third Circuit has held a party may be held liable for a civil RICO violation as an aider or abettor. *Petro–Tech, Inc. v. Western Co. of N. America,* 824 F.2d 1349, 1356–59 (3d Cir.1987). In this Circuit, aider and abettor liability exists where the plaintiff establishes the existence of an independent wrong, knowledge of that wrong and substantial assistance on the part of the aider or abettor to effectuate that wrong. *Cammer,* 711 F.Supp. at 1296; *Monsen v. Consolidated Dressed Beef Co.,* 579 F.2d 793, 799 (3d Cir.), *cert. denied,* 439 U.S. 930, 99 S.Ct. 318, 58 L.Ed.2d 323 (1978); *Landy v. Federal Deposit Ins. Corp.,* 486 F.2d 139, 162–63 (3d Cir.1973), *cert. denied,* 416 U.S. 960, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974).

As with the other motions of the Roberts Defendants, the argument in favor of dismissing the Complaint is based on the claim that the allegations do not set forth the fraudulent conduct of the individual Roberts Defendants. The Complaint and the Stop Order, however, explain in detail the roles of Fiorese, Galiardo, Perfetti and Kanoff in setting up the fraudulent scheme with the Hughes Capital defendants. The guilty plea transcripts of Weiss, Reifler and Kanoff set forth the roles of the Roberts Defendants other than Greenberg. According to the record, the entire public offering of Hughes Capital was placed in accounts controlled by the Roberts Firm and individual Roberts Defendants controlled and profited from trading in the Aftermarket.

 The same is true of the Plaintiffs' attempt to plead the existence of a RICO conspiracy. The Third Circuit has established a clear test for the allegation of conspiracy under section 1962(d):

> To plead a conspiracy adequately, a plaintiff must set forth allegations that address the period of the conspiracy, the object of the conspiracy, and the certain actions of the alleged conspirators taken to achieve that purpose.... Additional elements include agreement to commit predicate acts and knowledge that the acts were part of a pattern of racketeering activity.

*Shearin v. E.F. Hutton Group, Inc.,* 885 F.2d 1162, 1166–67 (3d Cir.1989) (citations omitted). The Plaintiffs have met their burden with respect to the elements of a conspiracy by demonstrating, through the Complaint and the extraneous material before the court, the facts discussed above.

### 2. *Enterprise*

The Plaintiffs have also come forward with factual evidence of a RICO enterprise. RICO defines "enterprise" to include "any individual, partnership, corporation, association, or other legal entity and any union or group of individuals associated in fact though not a legal entity." 18 U.S.C. § 1961(4) (1982). To establish that the Roberts Firm is an enterprise, Plaintiffs must demonstrate:

> (1) that the enterprise is an ongoing organization with some sort of framework or superstructure for making or carrying out decisions; (2) that the members of the enterprise function as a continuing

unit with established duties; and finally (3) that the enterprise must be separate and apart form the pattern of activity in which it engages.

*Cemar, Inc. v. Nissan Motor Corp.,* 678 F.Supp. 1091, 1103 (D.Del.1988) (quoting *Seville,* 742 F.2d at 789–90).

■ An enterprise must exist separately and apart from the RICO defendant. *Town of Kearny v. Hudson Meadows Urban Renewal Corp.,* 829 F.2d 1263, 1266 (3d Cir.1987); *Bennett v. United States Trust Co. v. New York,* 770 F.2d 308, 315 (2d Cir.1985), *cert. denied,* 474 U.S. 1058, 106 S.Ct. 800, 88 L.Ed.2d 776 (1986); *United States v. Computer Sciences Corp.,* 689 F.2d 1181, 1190 (4th Cir.1982), *cert. denied,* 459 U.S. 1105, 103 S.Ct. 729, 74 L.Ed.2d 953 (1983); *Elysian Fed. Sav.,* 713 F.Supp. at 757. *But cf. Petro–Tech,* 824 F.2d at 1360 (enterprise and defendant need not be distinct for purposes of section 1962(a)).

■ It has been noted: "The distinction between the enterprise and the person conducting the affairs of the enterprise focuses attention on the culpable party and 'recognizes that the enterprise itself is often a passive instrument or victim of the racketeering activity.'" *Elysian Fed. Sav.,* 713 F.Supp. at 757. In this case, it is clear the Roberts Firm is the enterprise through which the Roberts Defendants are alleged to have committed the securities fraud in connection with the sale of Hughes Capital securities. The individual Roberts Defendants are alleged to have conducted the affairs of the Roberts Firm both through their status as officers and directors of the Roberts Firm and their actual participation in the day-to-day management of operations. The Roberts Firm has not been named as a defendant and the allegations of the Complaint satisfy the liberal pleading requirements accorded to allegations of enterprise. *Cemar, Inc.,* 678 F.Supp. at 1106. The motion to dismiss the Complaint for failure to plead a RICO enterprise is denied.

### 3. *Pattern of Racketeering Activity*

■ "Racketeering activity" within the meaning of RICO includes state law crimes such as murder, bribery and extortion, and federal crimes such as mail fraud, wire fraud and securities fraud. 18 U.S.C. § 1961(1). A "pattern of racketeering activity" requires at least two acts of racketeering activity within a ten year period. 18 U.S.C. § 1961(5). In *Sedima,* while the Court did not come forward with a clear benchmark for determining what constitutes a pattern, it did drop a footnote which reads as follows:

> As many commentators have pointed out, the definition of a "pattern of racketeering activity" differs from the other provisions in § 1961 in that it states that a pattern *"requires* at least two acts of racketeering activity." § 1961(5) (emphasis added), not that it "means" two such acts. The implication is that while two acts are necessary, they may not be sufficient. Indeed, in common parlance two of anything do not generally form a "pattern." The legislative history supports the view that two isolated acts of racketeering activity do not constitute a pattern. As the Senate Report explained: "The target of [RICO] is thus not sporadic activity. The infiltration of legitimate business normally requires more than one 'racketeering activity' and the threat of continuing activity to be effective. It is this factor of *continuity plus relationship* which combines to produce a pattern." S.Rep. No. 91–617, p. 158 (1969) (emphasis added).

*Sedima,* 473 U.S. at 496 n. 14, 105 S.Ct. at 3285 n. 14.

The circuit courts have not reached a consensus as to how the pattern requirement, particularly the "continuity" aspect of it, is to be applied. *Morgan v. Bank of Waukegan,* 804 F.2d 970, 974 (7th Cir.1986) (noting different analyses used by the Fifth, Eighth and Eleventh Circuits). The Third Circuit has rejected approaches that limit the pattern requirement to proof of "two distinct unlawful schemes" or that state "a single scheme can constitute a RICO pattern only if the scheme is potentially ongoing or open-ended." *Barticheck v. Fidelity Union Bank First Nat'l State,* 832 F.2d 36, 39 (3d Cir.1987). Despite the

*Sedima* footnote which explains that a pattern requires at least to predicate acts, the *Barticheck* court held a single scheme could constitute a RICO pattern even if it was of limited duration or not open-ended. *See Environmental Tectonics v. W.S. Kirkpatrick, Inc.,* 847 F.2d 1052, 1063 (3d Cir.1988) ("allegations of illegal conduct that constitute a single, completed criminal episode are in some circumstances sufficient to describe a pattern of racketeering activity."), *aff'd on other grounds,* —— U.S. ——, 110 S.Ct. 701, 107 L.Ed.2d 816 (1990).

While articulating what a pattern does *not* have to be, the Third Circuit at the same time declined to set forth what qualities a RICO pattern must possess. The *Barticheck* court suggested that the concept of "a pattern of racketeering" defies concrete definition. *Id.* Instead, the court favored a case-by-case analysis of the pattern requirement:

> [T]he existence of a RICO pattern does not turn on the abstract characterization of racketeering acts as 'continuous' and 'related' but rather on a combination of specific factors such as the number of unlawful acts, the length of the time over which the acts were committed, the similarity of the acts, the number of the victims, the number of the perpetrators, and the character of the unlawful activity.

*Barticheck,* 832 F.2d at 38–39. Employing this analysis, the Third Circuit held the actions complained of constituted a racketeering pattern because the scheme involved two entities (a partnership and a bank) whose misrepresentations where repeated to roughly twenty individuals in connection with the making of loans to the Plaintiffs for purchases of shares of the partnership. *Id.*

The Third Circuit has also noted:

The target of the RICO statute, as its name suggests, is criminal activity that, because of its organization, duration, and objectives poses, or during its existence posed, a threat of a series of injuries over a *significant period of time.*

*Marshall–Silver I,* 835 F.2d at 66–67 (emphasis added). In *Marshall–Silver I,* the Third Circuit found that the filing of a false bankruptcy petition in an attempt to force the debtor into involuntary bankruptcy was not a RICO pattern because the complaint alleged a single victim, injury and "short-lived scheme with only two perpetrators." [30] *Id.* at 67.

Recently, the Supreme Court expanded on its footnote in *Sedima* to reveal a clearer picture of what constitutes a pattern of racketeering activity for RICO purposes. *See H.J. Inc. v. Northwestern Bell Telephone Co.,* —— U.S. ——, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). Recognizing that the development of the meaning of pattern "has proved to be no easy task," the Supreme Court rejected the proposition that predicate acts of racketeering can form a pattern only when a part of separate illegal schemes. *Id.* 109 S.Ct. at 2899. The Court also rejected the lenient standard of merely establishing two predicate acts and declared ties to organized crime are not an essential component of a RICO pattern. *Id.*

Rather, the Court held:

> In our view, Congress had a more natural and commonsense approach to RICO's pattern element in mind, intending a more stringent requirement than proof simply of two predicates, but also envisioning a concept of sufficient breadth that it might encompass multiple predicates within a single scheme that were related and that amounted to, or

---

**30.** For an examples of the fact-specific analysis under *Barticheck,* see the discussions in *Saporito,* 843 F.2d at 677–78 (pattern requirement met where plaintiff alleged the existence of four perpetrators committing thirty-two similar acts of misrepresentation to thirty-two victims over a period of six months), *Environmental Tectonics,* 847 F.2d at 1063–64 (complaint alleges pattern of racketeering activity where three perpetrators conducted a complex scheme to bribe foreign officials which, although consisting of only one payment, had potential to impact negatively on foreign relations and therefore had as its victims foreign citizens and citizens of this nation) and *Rose,* 871 F.2d at 365 (pattern sufficiently alleged where two perpetrators committed six related acts of bribery or extortion on four victims over a period of at least one year).

threatened the likelihood of, continued criminal activity.

*Id.* 109 S.Ct. at 2899 (citing *Petro–Tech,* 824 F.2d at 1355).

The Supreme Court again stressed continuity and relationship in defining a pattern. *Id.* 109 S.Ct. at 2900. The Court explained that continuity is primarily a temporal concept: " 'Continuity' is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *Id.* at 2902 (citing *Barticheck,* 832 F.2d at 39). The pattern requirement may be satisfied by demonstrating the predicate acts presented an implicit or explicit threat of long-term racketeering activity. *Id.*

Although it tacitly acknowledged the holding of *Barticheck* that a closed-ended, single scheme may constitute a RICO pattern, the Court added the requirement that the predicate acts continue over a substantial period of time:

> A party alleging a RICO violation may demonstrate continuity over a closed period by providing a series of related predicates extending over a substantial period of time. Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with long-term criminal conduct. Often a RICO action will be brought before continuity can be established in this way. In such cases, liability depends on whether the *threat* of continuity is demonstrated.

*Id.* (emphasis in original).

Most relevant to the facts of the case *sub judice* is the Supreme Court's statement that:

> The continuity requirement is … satisfied where it is shown that the predicates are a regular way of conducting defendant's ongoing legitimate business (in the sense that it is not a business that exists for criminal purposes), or of conducting or participating in an ongoing and legitimate RICO "enterprise."

*Id.*

The decision in *H.J. Inc.* directly impacted the *Barticheck* fact-intensive approach

to the pattern requirement by stating continuity is primarily a temporal concept. *Insurance Consultants of America,* 746 F.Supp. at 415–16. In *Swistock v. Jones,* 884 F.2d 755 (3d Cir.1989), the Third Circuit determined, in light of *H.J. Inc.,* the number of victims and perpetrators allegedly involved in the scheme cannot be the most significant factor of a RICO pattern under the *Barticheck* test. *Id.* at 758. The *Swistock* court stated: "The Supreme Court's unequivocal rejection of the multiple scheme rationale makes it unlikely that the limited number of persons alleged to be victims of a scheme establishes as a matter of law that a plaintiff has failed to plead a RICO pattern." *Id.*

Despite the apparent attempt of the *H.J. Inc.* Court to limit expansive interpretations of the RICO pattern requirement by injecting into it the element of time, the Third Circuit concluded *H.J. Inc.* broadened the interpretation. *Id.* Subsequent to *Swistock,* moreover, the Third Circuit reaffirmed the *Barticheck* approach to the pattern requirement, stating:

> Given its "natural and common sense approach to RICO's pattern element," we think it unlikely that Congress intended RICO to apply in the absence of a more significant societal threat. Moreover, if the Court in *H.J. Inc.* intended that the *duration* of the predicate acts or the threat arising therefrom should be determinative without reference to whether the societal threat was limited to a single, one time injury, we would not have expected the Court to eschew providing a specific standard in favor of a fact oriented, case-by-case development.

*Marshall–Silver Constr. Co., Inc. v. Mendel,* 894 F.2d 593, 597 (3d Cir.1990) ("*Marshall–Silver II*") (emphasis in original).

Observing that *H.J. Inc.* required an "adjustment" to the *Barticheck* approach to the continuity element of the pattern requirement, the *Marshall–Silver II* court determined *H.J. Inc.* is "entirely consistent" with the *Barticheck* test. *Id.* at 596. The *Marshall–Silver II* court declined to

read *H.J. Inc.* as defining continuity *solely* as a temporal concept. *Id.* Instead, it emphasized the consideration of the extent of the societal harm from the conduct at issue, expressing doubt as to whether Congress intended the "draconian penalties and remedies available under RICO" to be applied to frauds resulting in a single injury. *Id.* at 597. *Marshall–Silver II* clearly points to the size and magnitude of the fraud as being part of the pattern analysis. The *Marshall–Silver II* court nevertheless affirmed the dismissal of the complaint, as had the *Marshall–Silver I* court, because there appeared to be no threat of additional criminal conduct and the predicate acts were concluded in less than seven months. *Id.*

■ Applying the foregoing principles to the case at bar, it appears the Plaintiffs have alleged a course of conduct by the Roberts Defendants sufficient to raise a genuine issue of material fact as to the existence of a pattern of racketeering activity under RICO. The Roberts Defendants are alleged to have played significant parts in conducting an "ongoing legitimate business," *H.J. Inc.,* 109 S.Ct. at 2902, which "were related and that amounted to, or threatened the likelihood of, continued criminal activity." *Id.* at 2899.

The time period over which the Roberts Defendants are alleged to have participated in this conduct spans from approximately August 1986, when escrow was broken on the Hughes Capital initial public offering, to approximately December 1986, when the Roberts Defendants claim the Roberts Firm ceased activities as a market maker of Hughes Capital. While these few months may be a relatively short period of time, *see, e.g., Swistock,* 884 F.2d at 759 (fourteen months); *H.J. Inc.,* 109 S.Ct. at 2906 (six years), the plaintiffs have demonstrated the threat of continuing harm and future fraudulent conduct by the Roberts Defendants and the utilization of a legitimate business in connection with the fraud. *Compare Insurance Consultants of America,* 746 F.Supp. at 416–17 (private placement of securities by insurance company over a short period of time insuffi-

cient to constitute a threat of continuous harm).

The Third Circuit has indicated inferences may be drawn which suggest the existence of a threat of continuing harm. In *Barticheck,* the court determined the district court erred in failing to recognize that "[a]lthough the complaint states only that the defendants committed 'two or more acts' of mail fraud in furtherance of their alleged scheme, *it may fairly be inferred from the nature of the scheme* that defendants engaged in considerably more than two such acts." *Barticheck,* 832 F.2d at 39 (emphasis added). Drawing such inferences, it is possible to conclude the Roberts Firm was engaged in the sale of Hughes Capital securities from as early as March 1986, when Kanoff met with Reifler and Beall to discuss underwriting the Hughes Capital public offering, to July 1987, when the SEC issued the Stop Order.

Kanoff, who was president, director and shareholder of the Roberts Firm, admitted at his guilty plea that "between around March 15th, 1985 and February 1989 [he] did agree and conspire with others including Fred Galiardo, Leonard Tucker, John Perfetti, Al Lieb, Albert Weiss and others to use and employ manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities at [the Roberts Firm]. . . ." Schlesinger Aff., Ex. B at 18. Plaintiffs have alleged and supported with specific record data the existence of a widespread scheme to defraud investors of Hughes Capital and the utilization of a legitimate business to do so. This scheme involved numerous acts, including opening of account at the Roberts Firm for the deposit of the entire initial public offering, the domination and control of trading in Hughes Capital securities subsequent to the closing of the public offering, the detachment of the warrants from the securities units and the employment of sales forces to pressure investors into purchasing the stock. Taken as a whole, the record reveals a genuine issue of material fact with respect to the existence of a pattern of racketeering activity within the meaning of RICO. Accordingly, the motion of the Roberts Defendants to dismiss

this portion of the Complaint must be denied.

### E. *Claims Under NJUSL*

The Complaint contains two claims under the NJUSL. Count Three is based on section 24(a)(1) of the NJUSL, which imposes civil liability on persons who sell securities in violation of the state registration requirements. N.J.S.A. 49:3–71(a)(1). The Roberts Defendants argue this claim is defective because section 24(a)(1) applies to unregistered securities and the Plaintiffs cannot allege the securities of Hughes Capital were unregistered under New Jersey law when they were sold. Roberts Defendants' Brief at 31.

■ Section 24(a)(1) of the NJUSL provides:

"Any person who ... [o]ffers or sells a security in violation of section 8(b) [N.J. S.A. 49:3–55 (unlawful representations concerning registration)] 9(a) [N.J.S.A. 49:3–56 (broker-dealer, agent or investment advisor; registration requirement)] or 13 of this act [N.J.S.A. 49:3–60 (offer or sale; registration requirement; exemption)] ... is liable to the person buying the security from him. . . ."

N.J.S.A. 49:3–71(a)(1). Liability under section 24(a)(1) exists for the issuer of securities which should have been registered but were not. *Cola v. Terzano,* 129 N.J.Super. 47, 54, 322 A.2d 195 (L.Div.1974), *aff'd,* 156 N.J.Super. 77, 383 A.2d 460 (App.Div.1977); *see also Zendell v. Newport Oil Corp.,* 226 N.J.Super. 431, 544 A.2d 878 (App.Div. 1988). Plaintiffs concede the securities of Hughes Capital were registered under New Jersey law by way of coordination with the federal registration pursuant to N.J.S.A. 49:3–61.1. Complaint, ¶ 112; Plaintiffs' Brief at 75. The Plaintiffs have not demonstrated that the Stop Order retroactively suspended the registration of the Hughes Registration Statement or impacted in any way the registration of the Hughes Capital securities under the NJUSL. It therefore appears the Plaintiffs cannot maintain their cause of action under section 24(a)(1). Count Three of the Complaint is dismissed with prejudice.

■ Count Four of the Complaint sets forth the claim that the Roberts Defendants violated section 24(a)(2) of the NJUSL. N.J.S.A. 49:3–71(a)(2). Section 24(a)(2) sets forth civil penalties for the sale of securities by means of any untrue statement of material fact or omission to state a material fact. *Id.* Liability under this section may be imposed directly on a seller of securities or indirectly on a control person of such a seller. N.J.S.A. 49:3–71(b). For the reasons discussed previously in the section addressing control person liability under the federal securities laws, the motion of the Roberts Defendants to dismiss Count Four for failure to allege control person liability is denied. *Zendell,* 226 N.J.Super. at 439–40, 544 A.2d 878 (discussing control person liability under NJUSL by reference to federal law).

The Roberts Defendants also argue Count Four should be dismissed because it fails to allege scienter. Section 24(a)(2) states:

Any person who ... [o]ffers or sells a security by means of any untrue statement ... is liable to the person buying the security from him ... provided, however, that the person buying the security must sustain the burden of proof that the seller knew of the untruth or omission and intended to deceive the buyer. . . .

N.J.S.A. 49:3–71(a)(2). However, as noted previously, the Roberts Defendants are on notice of the claims against them. The Complaint generally alleges scienter and this meets the requirements of Fed.R. Civ.P. 9(b). The Roberts Defendants have provided no reason to believe the requirements of section 24(a)(2) are more or less stringent than federal law. Therefore, the motion to dismiss Count Four is denied, except as to Greenberg.

### F. *Claims Under FISPA*

Counts Five and Six of the Complaint set forth the Plaintiffs' claims under the Florida Securities Laws. Count Five asserts a claim based upon section 517.211(1) of the FISPA. Fla.Stat.Ann. § 517.211(1). As with section 24(a)(1) of the NJUSL, the

operative statute of Count Five applies only to securities which are not registered under Florida law. Fla.Stat.Ann. § 517.07. The Plaintiffs concede the securities of Hughes Capital were registered in Florida. Complaint, ¶ 132. Therefore, Count Five must be dismissed with prejudice.

Count Six of the Complaint is based upon section 517.211(2) of the FISPA. Fla.Stat. Ann. § 517.211(2). This statute provides as follows:

> Any person ... selling a security in violation of [section] 517.301, and every director, officer, partner, or agent of or for the ... seller, if the director, officer, partner, or agent has personally participated or aided in making the sale or purchase, is ... liable to the person ... purchasing the security from such person....

*Id.* Despite the arguments of the Roberts Defendants to the contrary, the record before the court adequately establishes liability of the Roberts Defendants, other than Greenberg, under this statute. The reasoning applicable to this statute is the same as that previously applied to the federal and New Jersey securities laws.

 Finally, the Roberts Defendants argue the FISPA claims must be dismissed because the Plaintiffs have not alleged they purchased their securities in Florida or that the Roberts Defendants committed any wrongful acts in Florida in connection with the sale of Hughes Capital securities. In *Edgar v. Mite Corp.*, 457 U.S. 624, 641, 102 S.Ct. 2629, 2640, 73 L.Ed.2d 269 (1982), the Supreme Court held that the Commerce Clause of the United States Constitution is violated where a state blue sky law purports to regulate transactions occurring outside the state. *Id.* at 643, 102 S.Ct. at 2641. In this case, the Plaintiffs are not Florida residents, nor do they allege they purchased the securities of Hughes Capital in Florida.

The Complaint alleges, however, "most, if not all of the acts and transactions which led to the offer and sale of Hughes [Capital] Securities ... took place in Florida" and "many of the materially misleading untrue statements ... were made by Florida residents." Complaint, ¶ 146.[31] These allegations are bolstered by the Stop Order, which states Hughes Capital was incorporated in Florida, the fraudulent plan to market the securities was devised in Florida, the Roberts Firm maintained offices in Florida, Hughes Capital engaged a Florida public relations firm to disseminate information concerning the purported acquisition of the target companies including Conserdyne, the brokerage accounts for certain nominee purchasers of Hughes Capital securities were opened under a Florida address of Reifler and Knoblauch moved to Florida at the behest of Beall and Reifler to take a position at Hughes Capital. Richards Aff., Ex. H. Finally, the interrogatory answers of Wiley state he purchased Hughes Capital securities upon the advise of a broker at the Roberts Firm. *Id.*, Ex. A. It is not clear where this broker was located, but the Plaintiffs claim the first purchases of Hughes Capital securities by Wiley were made through the Roberts Firm's offices in Florida. Plaintiffs' Brief at 78 & 82. On the basis of the partial record before the court, it cannot be said that there is no genuine issue of material fact or that the Complaint fails to allege the sale of Hughes Capital securities in Florida. Therefore, the motion to dismiss Count Six is denied, except as to Greenberg.

*Conclusion*

For the foregoing reasons the Complaint is dismissed on all counts in favor of Greenberg. The Plaintiffs are granted leave to replead against Greenberg upon a more fully developed factual record, if appropriate and pursuant to Fed.R.Civ.P. 11. Counts Three and Five of the Complaint are dismissed with prejudice. The motions of the Roberts Defendants to dismiss and/or for summary judgment are denied in all other respects.

---

**31.** This allegation raises the question whether Florida is a more appropriate or convenient venue for the litigation of this dispute. 28 U.S.C. § 1404. The parties are directed to submit, by 17 September 1990, briefs not longer than fifteen pages concerning the possible transfer of this case to the appropriate district in Florida.

Counsel for all parties and all *pro se* litigants are to appear on a date to be set by the court for a status conference concerning certification of the putative class and coordination of the future course of this case. In addition, counsel are advised to comply with the directions set forth in footnote 31 of this opinion. An appropriate form of order accompanies this opinion.